**UNITED STATES of America,**

v.

**Frank IACABONI, Defendant.**

**No. CRIM.A.01–30025–MAP.**

United States District Court,
D. Massachusetts.

Aug. 13, 2002.

Andrew Levchuk, United States Attorney's Office, Springfield, MA, for U.S.

Thomas J. Butters, Butters, Brazilian & Small, L.L.P., Boston, MA, for Frank Iacaboni.

*MEMORANDUM OF DECISION*

PONSOR, District Judge.

## I. *INTRODUCTION*

On March 26, 2002, defendant Frank Iacaboni pled guilty to two counts of gambling-related conspiracy, one count of managing an illegal gambling business, and one count of money laundering conspiracy. In a separate information he also pled guilty to substantive money laundering. In the plea agreement, defendant and the Government agreed to a bench trial on whether defendant's house, located at 640 Union Street in Leominster, Massachusetts, and various funds were subject to forfeiture as "involved in" the money laundering conspiracy. On April 17, 2002, the court began a three-day bench trial and heard testimony from six witnesses. As the following findings of fact and conclusions of law show, $384,245.00, but not 640 Union St., will be forfeited pursuant to 18 U.S.C. § 982(a)(1).

## II. *FINDINGS OF FACT*

1. In Count I of the indictment, defendant was charged with entering into a conspiracy to conduct an illegal gambling business in violation of 18 U.S.C. § 321 from approximately 1995 until March, 1998. In Count II, defendant was charged with conducting an illegal gambling business in violation of 18 U.S.C. § 1955. In Count III, defendant was charged with entering into a conspiracy to conduct an illegal gambling business involving interstate travel in violation of 18 U.S.C. § 371. In Count IV, defendant was charged with entering into a conspiracy to launder money in violation of 18 U.S.C. § 1956(h) from approximately 1995 until March, 1998. In Count V, defendant was charged with money laundering on December 23, 1997, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Finally, the indictment contained a forfeiture allegation pursuant to 18 U.S.C. § 982(a)(1), seeking "any property, real or personal, involved in" the money laundering conspiracy.

2. Count I of the information charged defendant with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

3. Pursuant to a plea agreement, defendant pled guilty to Counts I through IV of the indictment and Count I of the information. The Government agreed to dismiss Count V of the indictment.

4. A bench trial on the forfeiture allegation commenced on April 17, 2002.

5. The first witness was Robert Bolaski ("Bolaski"), who became a "phone man" for defendant in the early 1990's. With the exception of approximately three years from 1994 through 1996, Bolaski worked for defendant until March, 1998. Bolaski testified mainly about his involvement with defendant's bookmaking business from 1997 until March, 1998 and, in particular, the 1997 football season.

6. Bolaski explained that a "phone man" takes and registers bets from gamblers over the phone.

7. In a typical encounter, the gambler telephones the phone man, and the phone man informs the gambler of the "point spread" for a particular sporting event. The point spread is available from Las Vegas, or on a sports ticker. The gambler then informs the phone man of the desired betting amount, and the phone man registers the bet.

8. Defendant provided each phone man working for him with a list of gamblers who were permitted to place bets. Bolaski's list during most sporting seasons contained approximately 40–50 people.

9. Each phone man ran what was called an "office." Defendant provided his phone men with a fax machine, and reimbursed them for the cost of their phone bills in the amount of approximately $50.00 per month. There was no testimony on where or how Bolaski was reimbursed for his phone bill.

10. Defendant paid Bolaski a salary of $300.00 weekly. Bolaski worked for defendant for the entire 1997 football season. The regular football season, excluding the playoffs, is seventeen weeks long. Thus, Bolaski received at least $5,100.00 in salary from defendant in 1997 (17 weeks × $300.00).

11. Bolaski generally was paid on Mondays. Most of the time, defendant would pay Bolaski in cash at a location across the street from defendant's legitimate business, a company known as "Mass Pallet."

12. Defendant employed Bolaski, and others, to "correct," or check, the figures of each individual office. Bolaski would make sure that defendant's other offices had correctly tabulated the results of a particular betting day and, in particular, had correctly calculated how much the organization owed, or was owed by, a particular bettor.

13. A document containing the betting results from each office would be faxed to defendant at defendant's house at least on a weekly basis.

14. Another of defendant's offices was run by Ryan Gallagher ("Gallagher"), who also testified. Like Bolaski, Gallagher was paid $300.00 per week for his services during the 1996 football season and was reimbursed for his phone line. In the 1997 football season Gallagher's weekly pay was raised to $350.00 per week. Thus, Gallagher received a total of $11,050.00 in salary for his work during the 1996 and 1997 football seasons (17 weeks × $300.00 + 17 weeks × $350.00).

15. Defendant compensated Gallagher and Bolaski with proceeds from his illegal gambling business.

16. Gallagher testified that he was paid at Gallagher's house, or "wherever [defendant] was."

17. Gallagher handled between 15 and 20 customers for defendant. Like Bolaski, Gallagher would take bets over the phone, and tabulate the results. Gallagher would then create a spreadsheet of sorts listing the amounts the office owed and was owed. Gallagher would not fax this document to defendant, however. Instead, Gallagher would bring the tabulation sheet to defendant at defendant's business, defendant's home, or to some other location per instructions.

18. Gallagher and Bolaski both testified that the volume of betting in defendant's gambling business varied. Bolaski estimated that on a bad week, defendant's operation might owe up to fifteen to twenty thousand dollars to winners. On a good week, defendant's operation might be owed twenty to twenty-five thousand dollars from gamblers who had lost.

19. Winners were paid with the proceeds of the illegal gambling business.

20. Gallagher credibly testified that his office paid out approximately $10,000.00 per week to winning bettors, averaged over the entire seventeen-week football season. Thus, his office alone paid out approximately $170,000.00 per season.

21. The court also heard testimony from one of defendant's phone-in bettors, Larry Landman ("Landman"). Landman was a drywaller in Vermont, and placed bets with one of defendant's offices over the phone. He bet every weekend during the football season, and placed some bets on baseball and basketball as well. Often, Landman would drop off the money he owed defendant in cash at specified locations. When Landman won, he would pick up the money he was owed at the same locations.

22. On other occasions, Landman sent personal checks to defendant. These checks often bore the notation "personal loan." This subterfuge was Landman's idea, not defendant's. However, defendant took advantage of the Landman ploy, and did not attempt to correct the deception created by Landman's notation.

23. Defendant deposited Landman's checks into his personal bank account

and co-mingled them with his legitimate funds in order to conceal the illegal nature of the Landman proceeds.

24. The Government presented evidence of twenty-one checks that Landman sent defendant in satisfaction of his gambling losses. Defendant deposited each of these checks into his personal bank account.[1] Landman checks deposited after May 24, 1996, included checks for $900.00 and $735.00 deposited on May 28, 1996; a check for $610.00 deposited on November 4, 1996; a check for $800.00 deposited on November 12, 1996; checks for $110.00 and $890.00 deposited on November 25, 1996; two checks for $975.00 deposited on December 3, 1996; and checks for $600.00 and $900.00 deposited on December 16, 1996, for a total of $7,495.00.

25. In addition to the phone betting operation, defendant also conducted an illegal "football tickets" business. A football ticket was a rectangular card that listed approximately 40 football games. A gambler could attempt to predict the winner of anywhere between four and ten games, or bet upon the score of the game, and put down between $1.00 and $10.00. A gambler's potential winnings increased depending upon the amount bet, and the number of games correctly picked.

26. The court heard testimony from Robert Davies ("Davies"), who handed out and collected football tickets for defendant. Davies would distribute and collect the football tickets in, as he put it, "a couple factories, a couple restaurants." After all the tickets

and money were collected, Davies turned in the tickets and money on Saturdays. Davies collected the money that was to be paid to winning bettors on Mondays.

27. Davies was paid a fifteen percent commission for his work with the football tickets and received no regular salary. The amount of money that Davies personally accepted with the football tickets varied from less than $100.00 to almost $1,000.00 per week.

28. Like the sheets from the bets that were phoned in, the football tickets needed to be "corrected," meaning examined to insure that winners and losers were denominated correctly. The court heard testimony from two individuals who corrected football tickets for defendant: Bolaski and Tina LaClair ("LaClair").

29. Bolaski and LaClair's task, when they corrected football tickets, was to first determine that the proper amount of cash accompanied each ticket. Second, they would calculate which tickets contained "winners" who had correctly predicted the outcome of four or more games. Finally, they would make up envelopes for the winners filled with the proper amount of cash. Bolaski received an additional $100.00 per week, over his normal $500.00 salary, when he corrected football tickets.

30. Bolaski corrected football tickets for defendant a few times at defendant's residence. While Bolaski was at defendant's house, he noticed a betting sheet he had faxed to defendant near defendant's fax machine in an upstairs room.

---

1. There is a five-year statute of limitations for money laundering. The indictment was handed down May 24, 2001. Therefore, only those checks deposited after May 24, 1996 may be considered in the forfeiture analysis.

31. Bolaski would make up correction sheets as part of the process of correcting the football tickets. Government's Exhibit 3, seized during a trash search, indicates that one week defendant received $6,944.00 in proceeds from football ticket bets (after commissions were paid out), and during a second week defendant received $6,595.00 (after commissions were paid out). Bolaski testified, however, that $6,595.00 was "a real good week."

32. Bolaski testified that, often, he would meet Davies to pick up or drop off the football tickets. When Bolaski corrected tickets at defendant's house, however, Bolaski observed defendant fishing the football tickets and cash out of a garbage can in the garage attached to his house at 640 Union St. in Leominster.

33. In addition to his work with defendant, Bolaski ran a small football ticket business of his own. Bolaski used the same tickets as defendant, and had the same betting lines. Therefore, when defendant won with his football tickets, Bolaski won, and when defendant lost, Bolaski lost.

34. Bolaski testified that he lost money overall in 1997 on his football ticket business.

35. LaClair lived with defendant at 640 Union St. from approximately March, 1994 until November, 1999, when their romantic relationship ended. LaClair was responsible for the household bills and expenses and had access to defendant's checking account while they were living together.

36. Defendant gave LaClair checks and cash to deposit in the account. Approximately sixty percent of the deposits were in cash, although this percentage varied throughout the years they lived together. LaClair testified that she assumed that the cash deposits reflected defendant's legitimate winnings at the racetrack. However, bank records reflect that $41,870.55 in cash was deposited in defendant's account between 1995 and March, 1997. Defendant's federal income tax forms for 1995, 1996, and 1997 report a total of only $17,789.00 in gambling winnings. Defendant was ostensibly unemployed during most of this time.

37. Defendant first asked LaClair to correct football tickets in 1996.

38. LaClair testified that, when she corrected tickets for defendant, the football tickets along with the cash wagered would be found in a trash can in the garage at 640 Union St.

39. At defendant's direction, LaClair would retrieve the tickets from the trash can in the garage, correct the tickets, and place the winners' envelopes back in the trash can when she was finished. LaClair performed this task approximately ten or twelve times between 1996 and 1998. The largest amount of cash LaClair remembered pulling from the can was "maybe $3,700.00—rarely."

40. In December, 1997, defendant asked Bolaski to deliver an envelope to Al Bruno ("Bruno"), a man whom the Government alleges to be an organized crime figure. Defendant gave Bolaski the envelope at his house in Leominster.

41. When Bolaski arrived at the restaurant where he was to deliver the envelope, he was stopped and searched by law enforcement officers.

42. The officers seized the envelope. It contained $10,000.00 cash, and a letter addressed to "My Pal." The letter contained some personal greetings, and an apparent request. On page 1, defendant wrote, "Please, please grab

that Anthony for me. He has made me look like an *ass*." (emphasis in original). On page 2, the request is apparently made again, "[o]nce again please get that fuckin' Anthony to pay me, (21,300), it has been a year, and things will loosen up for both of us. You have to take care of it. The Shoe can only do so much." (Exhibit 19). The court heard testimony that "the Shoe" was defendant's collection agent.

43. Defendant told Bolaski that the $10,000.00 cash in the envelope was intended to repay Bruno for a loan in connection with defendant's legitimate pallet business.

44. The Government also introduced testimony from defendant's accountant, Joseph Fraticelli ("Fraticelli"), who prepared defendant's tax returns from 1995 through 1997. Although Fraticelli required his clients to record all personal loans as "notes payable," Fraticelli could recall no note payable being given to him to record a personal loan to defendant from Adolfo Bruno.

45. In January, 1996, the FBI searched 640 Union St. pursuant to a warrant and seized gambling sheets of the sort that Bolaski and Gallagher would fax or deliver to defendant, and a sheet of paper listing Landman's address along with others. This evidence confirmed that defendant had been receiving faxes related to his illegal gambling business at 640 Union St.

46. Following conclusion of the bench trial, the court sentenced defendant on June 9, 2002, without making a final decision on the forfeiture issues. He received a sentence of ten months in custody, a fine of $30,000, and three years of supervised release. Final disposition of the case was held in abeyance pending rulings on the forfeiture issues.

47. Final argument on the forfeiture issues was heard on June 28, 2002. Supplemental papers were received on July 15, 2002.

## III. CONCLUSIONS OF LAW

### A. Legal Standards

#### 1. Notice and the Indictment

One preliminary issue may be disposed of without difficulty. Defendant argues that 640 Union St. may not be subject to forfeiture because it was not specifically listed under the forfeiture allegation in the indictment. Defendant is mistaken. As the Government points out, Rule 32.2 governs criminal forfeiture. It requires only that the indictment "contain[ ] notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute." Fed.R.Crim.P. 32.2(a). The Advisory Committee Notes make clear that the rule "is not intended to require that an itemized list of the property to be forfeited appear in the indictment or information itself." Fed.R.Crim.P. 32.2, Advisory Committee's Notes (2000). Here, the indictment specifically stated that "the defendant shall forfeit any property, real or personal" subject to forfeiture under 18 U.S.C. § 982(a)(1). (Docket 1). In addition, defendant had actual notice of the Government's intent to seek the forfeiture of 640 Union St. in the plea agreement and suffered no prejudice. Therefore, defendant's notice argument regarding the Union St. house is unavailing.

#### 2. Forfeiture

It is important to note from the outset that only defendant's money laundering offense is directly relevant to the forfeiture allegation. The Government for some rea-

son did not bring a forfeiture claim pursuant to the gambling statute's forfeiture provision, 18 U.S.C. § 1955(d). Instead, the indictment's sole forfeiture allegation is under Title 18, § 982(a)(1), which provides,

> The court, in imposing sentence on a person convicted of an offense in violation of section 1956 ... shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1).

Given the language of the indictment, property that was used in defendant's illegal *gambling* business, but was *not* also "involved in" defendant's money laundering offense in violation of Section 1956, will not be subject to forfeiture. This distinction will be important in the discussion that follows.

### 3. *Money Laundering*

Defendant pled guilty to 18 U.S.C. § 1956(h), which provides that "any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." For purposes of forfeiture under 18 U.S.C. § 982(a)(1), defendant has conceded that any property "involved in" conduct actually constituting money laundering is properly considered property "involved in" the conspiracy to commit money laundering. The substantive money laundering offenses are defined in 18 U.S.C. § 1956(a)(1), which provides in relevant part:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction

which in fact involves the proceeds of specified unlawful activity—

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
> \*       \*       \*       \*       \*       \*
>
> (B) knowing that the transaction is designed in whole or in part
>
>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;
>
> \*       \*       \*       \*       \*       \*
>
> shall be sentenced to a fine ... or imprisonment ... or both.

18 U.S.C. § 1956(a)(1).

■ Thus, for any given conduct to constitute the substantive offense of money laundering, two main conditions must be met. First, the conduct must constitute a financial transaction knowingly involving the proceeds of an unlawful activity. Second, the conduct must have served the purpose of "promoting" the specified unlawful activity (here, the illegal gambling operation), or "concealing" the proceeds of the illegal activity. Each of these requirements will be discussed in detail below.

### a. *Financial Transaction Involving Proceeds*

In this case, only defendant's illegal gambling business is alleged to have generated "proceeds" that were knowingly involved in a financial transaction. Section 1956 defines "financial transaction" to broadly include, "a transaction which in any way or degree affects interstate or foreign commerce ... involving one or more monetary instruments" or "a transaction involving the use of a financial institution ...." 18 U.S.C. § 1956(c)(3). A "monetary instrument" is defined to include cash or a personal check, and "trans-

action" includes any transfer, delivery, or bank deposit.

■ The phrase "proceeds" of some form of unlawful activity is not defined in the statute, but has widely been interpreted to include any monetary instrument that is obtained as the result of an illegal activity, or the "total revenue" that is obtained from an illegal enterprise. *See United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir.1996)(" 'Proceeds' is a commonly understood word in the English language. It includes 'what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue.' "); *United States v. Akintobi*, 159 F.3d 401, 403 (9th Cir.1998)(same).[2]

Given this analysis, and the nature of an illegal gambling operation, defendant satisfied the initial requirement of the money laundering statute—*i.e.*, a monetary transaction knowingly involving the proceeds of an illegal activity—nearly every time illegal gambling money changed hands. For example, defendant engaged in a financial transaction involving the proceeds of his gambling business each time he (1) deposited Larry Landman's checks; (2) paid Bolaski or Gallagher's weekly salary; (3) reimbursed Bolaski and Gallagher for their phone lines or other supplies; (4) caused cash to be delivered to winning gamblers; (5) received cash from losing gamblers; or (6) gave Bolaski cash partly made up of the illegal proceeds to deliver to Bruno. If any of these financial transactions also "promoted" the gambling operation or "concealed" its proceeds as specified by subsections (A)(i) or (B)(i), that transaction

constituted money laundering. Moreover, any property "involved in" the particular transaction would be subject to forfeiture.

b. *Purpose Requirement: Promotion or Concealment*

As noted, to satisfy the purpose requirement, defendant must have engaged in the financial transaction for the purpose of either (1) *promoting* the carrying on of his illegal gambling business; *or* (2) *concealing* or disguising the nature, location, source, ownership, of control of the proceeds of his illegal gambling business. Each of these possibilities will be discussed below.

i. *Promotion*

The "promotion" prong of the money laundering statute is less intuitive than the "concealment" prong, and has less definite boundaries. This ambiguity arises from the fact that nearly every financial transaction involving the proceeds of an illegal enterprise may potentially be described as in some way "promoting" the criminal activity.

Financial transactions at the heartland of the "promotion prong" are easy to identify. For example, using the proceeds of illegal video poker machines to purchase more illegal video poker machines obviously promotes the carrying on of an illegal gambling enterprise. *See United States v. Conley*, 37 F.3d 970, 973 (3d Cir.1994). Likewise, using drug proceeds to purchase more drugs obviously promotes the carrying on of the drug trade. It is also well established that paying the salaries of

**2.** The Seventh Circuit has held in a recent case that "proceeds" must mean "net profits" rather than "total revenue." *United States v. Scialabba*, 282 F.3d 475 (7th Cir.2002). This court respectfully disagrees. Applying this construction to the statute, one could argue that so long as the illegal enterprise had no net profit, no money laundering prosecution would be possible. Because Congress could

not have intended such a result, the court follows the majority of circuits in holding that "proceeds" should be interpreted as "total revenue" rather than "net profits." *See also United States v. Hurley*, 63 F.3d 1, 21 (1st Cir.1995) (rejecting interpretation of "proceeds" as "net profits" in the RICO forfeiture context).

criminal employees promotes the carrying on of the criminal enterprise. *See id.* at 979 n. 12; *United States v. Leonard,* 61 F.3d 1181, 1186 (5th Cir.1995)(holding that "paying callers ... with the victim's money for the purpose of bilking more people ..." was money laundering).

Thus, it is clear that defendant engaged in "promotion" money laundering each time he used proceeds of his illegal gambling operation to (1) pay Bolaski and Gallagher's salaries, and (2) reimburse Bolaski and Gallagher for their phone lines or expenses. Bolaski and Gallagher were defendant's criminal employees. Paying their salaries, and reimbursing them for their phone lines and expenses, allowed defendant's illegal gambling business to carry on.

On the other hand, not every financial transaction involving the proceeds of an illegal activity constitutes money laundering. *See Leonard,* 61 F.3d at 1185 n. 2 ("Obviously not every dollar spent in every transaction that can be traced to a specified criminal activity violates 18 U.S.C. § 1956(a)(1)(A)(i). To so interpret the statute would convert the money laundering statute into a money spending statute.")(internal quotation omitted). A good meal provides nourishment to the criminal body and gives him the energy to commit the next crime. Prescription eyewear makes the criminal better able to see his next victim. An expensive haircut may make the criminal more confident, and thus more daring in his next criminal venture. Yet purchasing these items with the proceeds of an illicit enterprise is clearly not money laundering, despite their tendency to "promote," in some indirect way, the next crime. *See United States v. Jackson,* 935 F.2d 832, 841 (7th Cir.1991) (holding that rental payments that merely maintained defendant's lifestyle did not satisfy promotion requirement of subsection (A)(i)).

While the purchase of a video poker machine with illegal proceeds obviously constitutes money laundering, and the purchase of a haircut with illegal proceeds obviously does not, conduct in the middle of these two poles presents a harder case. Two targets of the Government's forfeiture count fall into this grey area: (1) the funds expended by defendant to pay his winners, and (2) the Union St. real estate. The question for this stage of the analysis is whether defendant's treatment of these two items of property, the cash and the house, constituted the crime of money laundering. A second question—whether either was "involved" in the money laundering offense—will be addressed at a later stage of this discussion.

Turning first to the cash paid out to winners, the two sides of the argument can be expressed as follows. On the one hand, paying winners is obviously part and parcel of the crime of operating an illegal gambling business. The First Circuit has made it clear that "Congress aimed § 1956 'at conduct that follows in time the underlying crime rather to afford an alternative means of punishing the prior specified unlawful activity.'" *United States v. Le-Blanc,* 24 F.3d 340, 346 (1st Cir.1994), *quoting United States v. Johnson,* 971 F.2d 562, 569 (10th Cir.1992). Paying winners may be seen as a bedrock feature of the "specified unlawful activity" itself, not money laundering. *See United States v. Richard,* 234 F.3d 763, 769 (1st Cir.2000) ("money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds"). Under the Government's logic, *any* illegal gambling operation would also be a money laundering operation. While it is true, as the Government points out, that the law in some circumstances permits the punishment of a single course of illegal conduct under different criminal statutes simultaneously, there is something troubling about the in-

evitable and almost exact overlap of the money laundering and gambling statutes in this case. As the Third Circuit has noted, "... Congress did not enact money laundering statutes simply to add to the penalties for various crimes in which defendants make money." *United States v. Conley*, 37 F.3d 970, 979 (3rd Cir.1994) (citation omitted).

On the other hand, it cannot be denied that the transactions in which defendant paid cash to his winners fall within the explicit words of the money laundering statute. First, it is clear on the record, and the court has found, that the cash involved in the transactions (*i.e.*, the money used to pay the winners) "represent[ed] the proceeds of some form of unlawful activity" and that defendant knew it. No doubt exists, in other words, that defendant knowingly used the cash flow from the illegal gambling operation to make these payments.

Second, it cannot seriously be disputed that these "financial transactions" (*i.e.*, the payments to winners) were intended "to promote the carrying on of the specified unlawful activity." Nothing makes an illegal gambling operation flourish more than the prompt payment of winners. Under this logic, payments by a gambling operation to winners are a form of money laundering, pure and simple. The Seventh Circuit has reached just this conclusion in a case on all fours with this one, *United States. v. Febus*, 218 F.3d 784, 790 (7th Cir.2000) ("... [P]ayments to winning players promoted the bolita's continuing prosperity by maintaining and increasing the players' patronage.").

Of the two arguments, the latter is the stronger. As noted, the transactions by which defendant paid his winners fall neatly within the terms of the money laundering statute. Nor does it strike the court as fundamentally unfair to view as money laundering the conduct of defendant that took the proceeds of his illegal business and used them to increase the popularity and viability of his criminal operation by paying his winners. In a gambling prosecution, payments to winners constitute money laundering.

The Union St. house presents a different picture, at least at this stage of the analysis. No evidence suggests that this real estate constituted the proceeds of an illegal activity, or that it was used in any "transaction," as that term is defined in the statute. The fact that substantial evidence suggests that the house was used to promote the illegal gambling operation is not sufficient to demonstrate that defendant's use of the house in any way constituted the crime of money laundering. Whether it was "involved in" the money laundering, under the forfeiture statute, will be addressed below.

### ii. *Concealment*

The proper scope of money laundering by concealment is a much simpler matter. Indeed, the language of the statute speaks for itself. As noted, a person commits "concealment" money laundering when he conducts a financial transaction involving the proceeds of an unlawful activity "knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, a person commits this version of money laundering each time he engages in a financial transaction with the design of hiding the location or source of the ill-gotten gains. Indeed, a person may commit money laundering merely by depositing the proceeds of an unlawful activity into a bank account in his own name, so long as he does so in order to "to conceal or disguise" the illegal nature or source of

those funds. *United States v. McGauley,* 279 F.3d 62, 71 (1st Cir.2002).

### B. *Forfeiture*

The above analysis has addressed what conduct constituted money laundering for purposes of the forfeiture statute. The next question is: What property is subject to forfeiture? As noted, 18 U.S.C. § 982(a)(1) provides that,

> The court, in imposing sentence on a person convicted of an offense in violation of section 1956 . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1).

At this stage of the analysis it is crucial to understand that this statute renders forfeitable only property "involved in" *money laundering.* The phrase "such offense" clearly refers to money laundering, *not* the "specified unlawful activity" that constitutes the predicate offense under § 1956. The Government had the option of seeking forfeiture directly under the forfeiture statute associated with the gambling offense, but chose not to do so. Under this indictment, only property "involved in" money laundering is subject to forfeiture.

The Government contends that the following items of real and personal property are subject to forfeiture: (1) 640 Union Street in Leominster, Massachusetts; (2) the $10,000 cash in the envelope seized from Bolaski; (3) the salaries paid to Bolaski and Gallagher over the 1996 and 1997 football seasons; (4) the Landman checks deposited in defendant's personal bank account; and (5) the cash paid out in winnings to bettors over the 1996 and 1997 football seasons. Each of these items is discussed in turn.

### 1. *640 Union Street*

Certainly, substantial evidence exists that the Union St. property was used to promote defendant's gambling business. Envelopes with money and documents were dropped off and picked up in the garage, faxes and phone calls related to the enterprise came to and went from the residence, football tickets were "corrected" on the premises, and meetings were held in the house. Given these facts, the Government would have a strong case for forfeiture of the house under the statute permitting forfeiture of "property . . . used in violation" of the gambling statute, 18 U.S.C. § 1955(d), if this provision had been cited in the formal charge. This statute, however, was not mentioned in the indictment and has not been offered as a justification for forfeiture here.

It is also clear that the evidence of record related to the Union St. property would satisfy one tine of the money laundering statute; it clearly *was* used to "with the intent to promote the carrying on of the specified unlawful activity," *i.e.,* the illegal gambling business. It is equally clear, however, that the conduct centering on the house itself could not constitute the crime of money laundering, since the house was neither the "proceeds" of any illegal activity, nor a part of any "transaction" as the money laundering statute defines that term. "Use" of a piece of property to promote a gambling activity may make that property subject to forfeiture under § 1955(d), but such "use" does not make the user guilty of money laundering under § 1956.

In seeking forfeiture of the Union St. property, the Government appears to confuse the phrase "specified unlawful activity" in 18 U.S.C. § 1956(a)(1) with the words "such offense" in 18 U.S.C. § 982(a)(1). On the facts of this case, the first phrase refers to the illegal gambling

operation, while the second refers to money laundering. To justify forfeiture under § 982, it is not enough merely to show that the Union St. property was involved in the gambling operation; the Government must demonstrate that the house was involved in money laundering.[3]

The evidence demonstrating such involvement in this case falls far short. The heart of an act of money laundering is a transaction involving illegal proceeds. Most of what the Government cites as support for its forfeiture claim against the house—the faxes and phone calls, the "correcting" of football tickets and the like—was not by any construction a "transaction" at all. This sort of criminal activity constituted merely conduct supporting the gambling operation and does not reflect involvement of the real property in money laundering.

The only activity occurring at the house that could conceivably be described as a "transaction" (i.e., a "purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition") occurred when defendant's employees periodically dropped off or picked up cash from the garbage can in defendant's garage. Significantly, the collection of money from bettors, and the payments to bettors, did not occur in the garage or any where else at the Union St. property; these "transactions" with the enterprise's customers occurred away from the premises. The "transfers" to and from defendant's garbage can constituted only the hand-off of cash from one co-conspirator to another, to be counted and, in some

cases, returned for re-delivery to the customer at another site away from the house. The course of behavior may be analogized to the division of cash proceeds derived from an illegal drug sale between the street dealer and his supplier.

■ The court is not persuaded, as a factual matter, that these "garbage can" transfers created a "substantial connection" between the Union St. real estate and any *money laundering* activity on the part of defendant. Put differently, the property here was neither the "situs" or the "nexus" of the money laundering crimes. *See United States v. 28 Emery St.*, 914 F.2d 1, 4 (1st Cir.1990). *See also United States v. White*, 116 F.3d 948, 952 (1st Cir.1997); *United States v. 221 Dana Ave.*, 261 F.3d 65, 69 n. 2 (1st Cir.2001); *United States v. 40 Clark Rd.*, 52 F.Supp.2d 254, 261 (D.Mass.1999).[4] The fact that the coconspirators sometimes parceled out the cash, and did their accounting, at the house did not tie the property closely enough to the money laundering activities to make the premises subject to forfeiture. Its use, on the facts of this case, was no more than "incidental or fortuitous." *Parcel of Land*, at 4, *citing United States v. 916 Douglas Ave.*, 903 F.2d 490, 494 (7th Cir.1990) (footnote omitted). While the forfeiture statute covering money laundering is broad, it cannot be stretched to require forfeiture of any site where felons pass cash back and forth, without losing its boundaries almost entirely. Since the 640 Union St. property

3. This same confusion appears to have infected some of the cases cited by the Government, which the court finds unpersuasive, where courts seem to have found property promoting the underlying "specified unlawful activity" subject to forfeiture under the money laundering statute, even where it does not appear to have been "involved" in the money laundering.

4. Although these cases were decided in the civil forfeiture context, or in the context of forfeiture pursuant to the criminal drug statute, the governing principles are applicable to § 982 forfeiture proceedings as well. *See United States v. Saccoccia*, 58 F.3d 754, 783 n. 25 (1st Cir.1995)(discussing "genealogy of modern criminal forfeiture" and noting that analysis is "equally applicable to criminal forfeiture under the money laundering laws.").

was "involved in" defendant's money laundering, at most, as a site where defendant and his henchmen dropped off and picked up cash, it is not subject to forfeiture under 18 U.S.C. § 982(a)(1).

### 2. $10,000 cash

■ The entire $10,000 cash Bolaski attempted to deliver to Bruno will be forfeited as property "involved in" the commission of money laundering through concealment. 18 U.S.C. § 1956(a)(1)(B)(i). As noted, defendant told Bolaski that the $10,000 was intended to repay a loan in connection with defendant's legitimate business. However, he agreed at trial that at least some of the cash in the envelope constituted proceeds from his illegal gambling business. Defendant engaged in a financial transaction when he transferred the cash to Bolaski for purposes of delivery to Bruno. Styling the entire sum as proceeds from defendant's legitimate business concealed the "source" of the cash, and calling the delivery a loan repayment disguised the "nature" of the transaction. Thus, defendant committed money laundering in violation of Section 1956(a)(1)(B)(i) when he attempted to deliver the cash to Bruno. The entire $10,000 was "involved in" this deception, and is therefore forfeit. *See United States v. McGauley*, 279 F.3d 62, 76 (1st Cir.2002)(comingling legitimate funds with illegitimate funds for the purpose of concealing the illegitimate funds renders the whole sum forfeit).

### 3. Landman's checks

■ The funds from the Landman checks are also subject to forfeiture. The Government correctly points out that there is little question that defendant engaged in a financial transaction involving the proceeds of an unlawful activity when he deposited Landman's checks into his personal bank account. Moreover, the court finds that defendant's purpose in depositing these funds in his general bank account was to conceal their illegal nature. Commingling tainted funds with legitimate funds "for the purpose of concealing the nature or source of the tainted funds" constitutes concealment money laundering. *McGauley*, 279 F.3d at 76. While it is true that simply "depositing the proceeds of unlawful activity in a bank account in his own name," is a "non-money laundering act," *Conley*, 37 F.3d at 979, here the aim was deception. Defendant took advantage of Landman's "personal loan" ruse and mixed the funds with legitimate monies to camouflage their nature. These funds will be forfeited.

### 4. Salaries

■ As discussed in detail above, the salaries and phone reimbursements defendant paid to Gallagher and Bolaski will be forfeited as funds directly "involved in" money laundering. Gallagher earned at least $11,050.00 in salary during the 1996 and 1997 football seasons, and Bolaski earned at least $5,100.00 in salary during the 1997 football season. Each was reimbursed $50.00 per month for their phone lines. Thus, defendant paid at least $200.00 for Gallagher's phone line over the 1996 football season, and $400.00 for Gallagher and Bolaski's phone lines over the 1997 football season, for a total of $600.00. Insufficient evidence was presented of how often Bolaski was given his $100.00 salary for correcting football tickets. No other evidence was introduced of additional reimbursements, salaries, or other operating expenses for defendant's illegal gambling business. Therefore, a total of $16,750.00 in salaries and operating expenses will be forfeited as directly "involved in" money laundering.

### 5. Winner's Payments

■ The funds defendant paid out in winnings over the 1996 and 1997 football

seasons also will be forfeited. As discussed in detail above, the transactions by which defendant paid his winners directly violated the money laundering statute. The funds paid to winners were thus "involved in" money laundering, and therefore are subject to forfeiture. With regard to the phone-in bettors, the court agrees that the Government's arithmetic is reasonable, supported by the evidence, and more than fair to defendant. With regard to pay-outs to winners on the football tickets, however, the court finds that the evidence is too speculative to support the figure proposed by the government.

Regarding the phone-in bettors, defendant's organization paid out at least $340,000.00 to winners over the 1996 and 1997 football seasons through Gallagher's office alone. As noted in the facts section, Gallagher credibly testified that his office paid out an average of $10,000.00 per week over the seventeen week football seasons in 1996 and 1997. The Government suggests that $340,000.00, which does not include payments from other offices or related to other sports, is an extremely conservative estimate of the sum paid to phone-in winners by defendant's organization. The court concurs, and $340,000.00 will therefore be subject to forfeiture.

Regarding the football ticket business, the court finds that the Government's figure of $51,000.00 is not supported by the evidence. This conclusion is based in large part on the fact that the Government erroneously sought the forfeiture of $51,000.00 in football ticket "proceeds." This formulation of its forfeiture theory was in error because, as noted above, mere "proceeds" collected from defendant's illegal gambling business were not necessarily "involved in" *money laundering.*

The court might speculate that defendant's payments to football ticket winners equaled the amount of defendant's proceeds. The testimony established that the 1997 season was not a good football ticket season. Indeed, Bolaski used the same tickets as defendant, and testified that he lost money overall in 1997. Thus, the court could guess that defendant paid out at least as much as he took in from football tickets in 1997. As the Government notes, a conservative estimate of the *proceeds* of defendant's football ticket business was $3,000.00 per week, or $51,000.00 for the seventeen week season. That sum might also represent the amount defendant paid out, if defendant, like Bolaski, did in fact lose money on the football ticket business in 1997.

This figure, however, is much too speculative on the evidence presented. The court will therefore order that the modest sum of $10,000.00 be forfeited as funds that were "involved in" payments to football ticket winners. Logic and statistics dictate that defendant had some winners, and $10,000.00 seems a more than reasonable estimate for forfeiture. Thus, a total of $350,000.00 in payments to phone-in and football ticket winners will be forfeited.

Adding this $350,000.00 to the $10,000.00 Bolaski attempted to deliver to Bruno, the $7,495.00 in deposited Landman proceeds, and the $16,750.00 in salaries and phone-related funds that were determined to be subject to forfeiture above, a total of $384,245.00 will be forfeited pursuant to 18 U.S.C. § 982(a)(1) as property "involved in" the violation of 18 U.S.C. § 1956(a)(1).

## IV. *CONCLUSION*

For the reasons set forth above, $384,245.00 is hereby ordered to be forfeited pursuant to 18 U.S.C. § 982(a)(1).

A separate Order will issue.

## *ORDER*

For the reasons stated in the accompanying Memorandum, the sum of

$384,245.00 is hereby ordered to be forfeited pursuant to 18 U.S.C. § 982(a)(1).

It is So Ordered.