# United States Court of Appeals
## For the First Circuit

No. 02-2141

UNITED STATES,

Appellee,

v.

FRANK IACABONI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Howard, Circuit Judges.

Thomas J. Butters, with whom Butters, Brazilian & Small LLP
was on brief, for appellant.
Andrew Levchuk, Assistant U.S. Attorney, with whom Michael J.
Sullivan was on brief, for appellee.

March 30, 2004

**HOWARD**, **Circuit Judge**.  In March 2002, Frank Iacaboni pleaded guilty to charges arising out of his operation of an illegal gambling business.  He appeals the district court's subsequent forfeiture order, contending that the court erred in its determination that $384,245 should be forfeited.  Concluding that the district court's reasoning is sound as to the bulk of the award, we affirm in part, but reverse and remand as to one category of funds included in the forfeiture.

## I.  Factual and Procedural Background

From 1995 through March 1998, Iacaboni conducted an illegal sports gambling operation in and around Leominster, Massachusetts.  Iacaboni's business included a few different "offices" headed by individuals hired to take bets from gamblers over the telephone.  Iacaboni also ran a "football ticket" business; bettors paid between $1 and $10 per "ticket," a card on which they checked off four or more predictions in dozens of upcoming games.

In May 2001, a grand jury indicted Iacaboni on charges of conspiracy to conduct an illegal gambling business (Count I), 18 U.S.C. § 371; operating an illegal gambling business (Count II), 18 U.S.C. § 1955; conspiracy to conduct an illegal gambling business involving interstate travel (Count III), 18 U.S.C. § 371; conspiracy to launder money from 1995 to March 1998 (Count IV), 18 U.S.C. § 1956(h); and money laundering on December 23, 1997 (Count

V), 18 U.S.C. § 1956(a)(1)(A)(i). The indictment also included forfeiture allegations seeking "any property, real or personal, involved in" Iacaboni's violations of 18 U.S.C. § 1956. 18 U.S.C. § 982(a)(1). At his arraignment, Iacaboni entered a plea of not guilty on all charges.

On March 26, 2002, Iacaboni changed his plea to guilty on Counts I through IV of the indictment, and the government agreed to dismiss Count V. Iacaboni also pleaded guilty to a criminal information charging him with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) in connection with the December 23, 1997 transaction that had been the subject of Count V.[1]

In April 2002, the court held a bench trial on the forfeiture allegations. The government presented the testimony of two of Iacaboni's employees, Robert Bolaski and Ryan Gallagher. They described their day-to-day duties, the size of their typical client roster (40 to 50 for Bolaski, and 15 to 20 for Gallagher), and their weekly salaries (ranging from $300 to $350). Bolaski estimated that Iacaboni's business might owe approximately $15,000 to $20,000 to winning bettors during a bad week, and expect to collect $20,000 to $25,000 from losing bettors during a good week.

---

[1]The December 23, 1997 transaction involved an attempted transfer of $10,000 to an individual the government alleged to be an organized crime figure. United States v. Iacaboni, 221 F. Supp. 2d 104, 109-10, 117 (D. Mass. 2002). Because Iacaboni does not contest the inclusion of these funds in the forfeiture order, the details of this transaction are not recounted here.

Gallagher testified that his office paid out an average of approximately $10,000 per week to winning bettors over the course of a seventeen-week football season. Both Bolaski and Gallagher testified that the volume of betting varied.

Larry Landman, one of Iacaboni's bettors, also testified at trial. He testified that he bet every weekend during football season, and that occasionally when he owed money to Iacaboni, he would send "personal checks" made out to the defendant.[2] He sometimes made the notation "personal loan" on the checks, a practice that was his own idea, not one suggested by Iacaboni. Iacaboni deposited Landman's checks into his personal account. The government presented evidence of nineteen checks given to Iacaboni by Landman, only nine of which were relevant to the forfeiture analysis because of the applicable five-year statute of limitations. These nine checks, deposited between May 1996 and December 1996, totaled $7,385.[3]

---

[2]These payments were technically made by personal money order, but were commonly referred to by the parties as "checks." Because the distinction is insignificant in our analysis, we adopt the "check" label used below.

[3]The district court found that the government had presented evidence of twenty-one checks, ten of which fell within the statute of limitations and totaled $7,495. Iacaboni, 221 F. Supp. 2d at 108. Our review of the record reveals that evidence of only nineteen transactions was introduced by the government, and that the district court mistakenly counted a $110 cash deposit as a tenth "check" in its calculation of amounts paid by Landman.

The court also heard testimony from Robert Davies, an agent of Iacaboni's, and Tina LeClair, Iacaboni's former girlfriend. These witnesses, along with Bolaski, described the operation of the football ticket business, including how bets were placed and winnings distributed.

In June 2002, Iacaboni was sentenced to ten months in custody, a fine of $30,000, and three years' supervised release. The district court heard argument on the forfeiture allegations soon thereafter. In August 2002, the district court ordered Iacaboni to forfeit $384,245 pursuant to 18 U.S.C. § 982(a)(1). This amount included (1) $340,000 in funds paid to winning phone-in bettors over the 1996 and 1997 football seasons; (2) $10,000 in funds paid to winning football ticket bettors; (3) $10,000 representing funds involved in the December 23, 1997 transaction; (4) $7,495 in checks from Landman; (5) $16,150 in salaries; and (6) $600 in phone expenses.[4] The district court declined to order that Iacaboni forfeit his residence in Leominster, a penalty sought by the government.[5] This appeal followed.

---

[4]On appeal, Iacaboni does not contest the forfeitability of items (3) and (6), the $10,000 in funds transferred on December 23, 1997, see n.1, above, and the $600 in phone expenses.

[5]The government had argued that the property was subject to forfeiture under 18 U.S.C. § 1956. The district court disagreed, concluding that "it is not enough merely to show that the Union St. property was involved in the gambling operation; the Government must demonstrate that the house was involved in money laundering." Iacaboni, 221 F. Supp. 2d at 116. Although the government initially cross-appealed, United States v. Iacaboni, No. 02-2259,

## II.  Analysis

Iacaboni contends that the district court erred in its determination of the amount to be forfeited because (1) the payouts to winning bettors were integral to the illegal gambling business and therefore could not be considered property involved in money laundering; (2) there was insufficient evidence to support a finding that $340,000 was paid out to phone-in bettors; and (3) the Landman checks were not property involved in money laundering.

A.        Payments to Winning Bettors

We review de novo the district court's determination of what constitutes forfeitable proceeds under 18 U.S.C. § 1956(a)(1)(A)(i).  The court found that $350,000, an amount representing payments to winning bettors, should be forfeited.[6] The statute provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; shall be sentenced to a fine of not more than $500,000 or twice the value of the property

---

that appeal was later voluntarily dismissed.

[6]Although the forfeiture of funds a defendant has transferred away may seem an unusual concept, detailed statutory provisions have been designed to accomplish this very end in drug and money laundering cases, and the defendant has not argued that these provisions are inapplicable. See 18 U.S.C. §§ 982(a), (b)(1); 21 U.S.C. § 853(p).

involved in the transaction, whichever is greater[.]

18 U.S.C. § 1956.[7]

Looking to the language of the statute, we first consider whether the payments to winning bettors constituted financial transactions involving the proceeds of illegal gambling, a specified unlawful activity. Id. § 1956(a)(1). The district court concluded that this portion of the statute had been satisfied, noting the breadth of the terms "financial transaction" and "proceeds." Iacaboni, 221 F. Supp. 2d at 111-12.

Iacaboni does not contest his participation in "financial transactions," but he does argue that "proceeds" refers to net income of the illegal gambling operation, not payouts, citing United States v. Scialabba, 282 F.3d 475 (7th Cir. 2002), cert. denied, 537 U.S. 1071 (2002). There, the Seventh Circuit held that money paid to winning players in an illegal video poker scheme could not be considered proceeds, defining proceeds as net profits. We have previously rejected Iacaboni's interpretation of the term "proceeds" in the RICO forfeiture context. See United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995)(quoting legislative history of RICO forfeiture provisions for the proposition that "the term

---

[7]Section 1956(a)(1)(A)(i) prohibits conduct sometimes referred to as "promotional" money laundering. Unlike "concealment" money laundering (i.e. financial transactions designed to conceal the source of the funds or to avoid transaction reporting requirements), which is governed by 18 U.S.C. § 1956(a)(1)(B), an intent to conceal is not an element of the crime.

'proceeds' has been used in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits"). Iacaboni has offered no rationale for abandoning that approach here.

Concluding that Iacaboni's financial transactions involved "proceeds" within the meaning of § 1956(a)(1), we turn to whether the transactions were intended to promote the gambling operation. Iacaboni asserts that payments to winning bettors cannot be considered "promotion" because these payments were an integral part of the illegal gambling business. Defining payouts as promotion, Iacaboni contends, is an impermissible alternative punishment for operating a gambling business. He argues for an interpretation of the statute that would require an additional promotional step beyond the mere operation of the illegal venture.

In addressing this argument, the district court opined that the payouts were not typical examples of promotion money laundering (such as the "plowing back" or reinvestment of criminal proceeds through the payment of business expenses, see B. Frederic Williams, Jr. & Frank D. Whitney, Federal Money Laundering: Crimes and Forfeitures 137-39 (1999)). The court also opined that, under the logic advanced by the government, "any illegal gambling operation would also be a money laundering operation." Iacaboni, 221 F. Supp. 2d at 113. But the court nevertheless concluded that the transactions fell within the reach of § 1956(a)(1)(A)(i), in

part because "[n]othing makes an illegal gambling operation flourish more than the prompt payment of winners," id. at 114 (citing United States v. Febus, 218 F.3d 784, 790 (7th Cir. 2000)), and in part because it was not "fundamentally unfair to view as money laundering the conduct of defendant that took the proceeds of his illegal business and used them to increase the popularity and viability of his criminal operation by paying his winners." Id.

We agree with the district court, and affirm on the grounds set forth in its opinion, as well as the following considerations. Crimes such as the operation of an illegal gambling ring create huge sums of cash, the use or disposition of which can prove problematic for illegal gambling operators who wish to stay beneath the radar of law enforcement agencies. Depositing the funds with a financial institution can trigger currency transaction reporting requirements, see Hurley, 63 F.3d at 12 (citing 31 U.S.C. § 5313), which in turn can bring the depositor the unwanted attention of the Internal Revenue Service or other government agencies.

Criminals dealing in large amounts of cash who wish to avoid the risks and practical difficulties of "putting it in the mattress" have thus developed strategies to avoid the creation of a paper trail that can lead to apprehension. They frequently "structure" their cash deposits so as to avoid reporting requirement triggers, see United States v. Saccoccia, 58 F.3d 754,

762 n.1 (1st Cir. 1995) (describing subdivision of cash into "smaller, unreportable amounts," a process also known as "smurfing"); use the cash to purchase valuables, see id. (recounting scheme whereby proceeds from Columbian drug cartel were laundered through purchases of gold); and use the cash to promote, or "move forward," Webster's Third New International Dictionary 1815 (1993), the unlawful scheme by which the cash was derived or another unlawful scheme, see United States v. London, 66 F.3d 1227, 1242-43 (1st Cir. 1995) (upholding money laundering conviction of operator of check-cashing business whose intentional failure to file currency transaction reports benefitted his bookmaking clientele). Recognizing the prevalence of these evasionary strategies, Congress in 1986 enacted § 1956 to outlaw (1) the structuring of financial transactions so as to avoid currency reporting requirements or to conceal the source of the funds, and (2) the promotion of unlawful activity through financial transactions involving the proceeds of a specified unlawful activity (of which running an unlawful gambling operation is one, see United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir. 1994)). Thus the statute's two "prongs." See n.7, above.

In our view, Iacaboni misses the point in asserting that defining the payouts as promotion would constitute an impermissible alternative punishment for an act that is an integral component of

an unlawful gambling business.[8]  Targeting the payouts reflects the decision of Congress (embodied in § 1956) to proscribe not only certain unlawful cash-generating schemes, but also the means by which they are practically carried out and hidden from investigators.  See LeBlanc, 24 F.3d at 346 ("Congress intended to criminalize a broad array of transactions designed to facilitate numerous federal crimes, including illegal gambling.").  Such a proscription empowers law enforcement to combat such schemes not only from a direct operational perspective, but also from the more indirect financial angle.  Viewed in this light, the district court's decision to forfeit the payouts to winning gamblers is consonant with the purposes for which Congress enacted 18 U.S.C. § 1956(a)(1)(A)(i).[9]  We hasten to add that we are only deciding

_____

[8]Of course, as we read the statutes, a gambling operation and money laundering will often occur together but each requires an element that the other does not, United States v. Conley, 37 F.3d 970, 978-79 (3d Cir. 1994), thereby satisfying the Blockburger test.  Blockburger v. United States, 284 U.S. 299 (1932).  We do not share the Seventh Circuit's doubts on this issue expressed in United States v. Scialabba, 282 F.3d 475, 477 (7th Cir. 2002).  There might, of course, be concerns if the government sought to forfeit the same property twice, but that is not a problem presented in this case.  Cf. United States v. Cunan, 156 F.3d 110, 116 (1st Cir. 1998).

[9]In his brief, Iacaboni ends his argument regarding the improper characterization of payouts as promotion with the statement: "For the same reason, the Court should also vacate the District Court's forfeiture order as it pertains to the $16,150 in salaries paid to agents."  Iacaboni Br. at 22-23.  Even if we consider this issue despite Iacaboni's failure to brief it properly, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), the argument has no merit.  The payment of salaries of employees is a common example of promotion within the meaning of

-11-

whether the facts of this case come within the term "promote" as used in this statute, and not as that term may have been used by Congress elsewhere in federal law.

B.        Calculation of Amount of Payments to Winning Phone-In Bettors

Iacaboni contends that even if the payments to winning bettors are properly characterized as promotion money laundering and thus forfeitable, the district court erred in calculating the amounts paid to winning phone-in bettors. The court found that Gallagher testified credibly that his office paid out an average of approximately $10,000 per week during the seventeen-week football season. The court concluded therefore that approximately $170,000 was paid out during each football season, totaling $340,000 over the course of two years. This calculation was based on Gallagher's office only,[10] and did not include bets on the playoffs or the Super Bowl. Likewise, it included only wagers on football games, although the Iacaboni operation also took bets on baseball, hockey

the statute. See Febus, 218 F.3d at 790; United States v. Leonard, 61 F.3d 1181, 1186 (5th Cir. 1995); see also B. Frederic Williams, Jr. & Frank D. Whitney, Federal Money Laundering: Crimes and Forfeitures 137 (1999) ("A manufacturer of cars would think it strange if one asserted that the payment of wages for its workers on the assembly line and for steel or other raw materials were not intended to help promote the company's continuation and success in the car industry."). We uphold the district court's finding that $16,150 in salaries is subject to forfeiture.

[10]The district court heard testimony that there were at least three offices in addition to Gallagher's within the Iacaboni operation.

and basketball.

The district court's factual findings regarding the amounts paid to winning phone-in bettors are reviewed for clear error.  See United States v. 15 Bosworth Street, 236 F.3d 50, 53 (1st Cir. 2001)(noting, in civil forfeiture context, that "the appellate process ought to respect the trial judge's superior feel for the case and his enhanced ability to weigh and evaluate conflicting evidence" (internal quotation omitted)).  The findings were based in part on a credibility determination to which we extend great deference, and in part on commonsense extrapolation. We conclude that the district court's findings were sound in light of the small segment of Iacaboni's business on which they were based.  Indeed, the amount ordered forfeited appears to be a reasonable and fair estimate.

C.        Landman Checks

Iacaboni contests the district court's finding that $7,495 in checks Landman paid to Iacaboni were forfeitable, alleging that the court improperly relied on a theory of concealment money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), when Iacaboni pleaded guilty only to promotion money laundering.  Id. § 1956(a)(1)(A)(i).   The government concedes that a variance occurred, but contends that it did not affect Iacaboni's

substantial rights.[11]

Here, the indictment alleged promotion money laundering, Iacaboni pleaded guilty to promotion money laundering, but -- to the extent the Landman checks are included in the forfeiture -- the sentence was based on a <u>concealment</u> money laundering theory. <u>See</u> <u>Iacaboni</u>, 221 F. Supp. 2d at 117 ("[T]he court finds that the defendant's purpose in depositing these funds in his general bank account was to conceal their illegal nature. Commingling tainted funds with legitimate funds 'for the purpose of concealing the nature or source of the tainted funds' constitutes concealment money laundering" (citation omitted)). The district court's forfeiture of the Landman checks on the basis of concealment money laundering, a charge that the government conceded at oral argument was not included in Count IV of the indictment, effectively altered the terms of the indictment. This alteration is a per se prejudicial "constructive amendment." <u>See</u> <u>United States</u> v. <u>Fisher</u>, 3 F.3d 456, 462-63 (1st Cir. 1993)("A constructive amendment occurs

---

[11]The government also argues that the issue was not preserved on appeal, and should therefore be subject only to plain error review. We do not agree. In his proposed findings of fact and conclusions of law submitted prior to sentencing, Iacaboni contended that the government had not charged any form of money laundering on the basis of Landman's checks. <u>See</u> Def's. Proposed Findings of Fact and Conclusions of Law No. 28. Iacaboni urged the district court to find that "[n]othing about these checks suggests that they were involved in a money laundering transaction. Indeed, the government has not even suggested that they were money laundering transactions, as they were not so charged in the Indictment." <u>See</u> Def's. Proposed Findings of Fact and Conclusions of Law No. 61.

when the charging terms of the indictment are altered, either literally or in effect, by the prosecution or court after the grand jury has last passed upon them." (internal quotation omitted)). Accordingly, we reverse the district court order to the extent the Landman checks are included in the forfeiture.[12]

### III.   Conclusion

For the foregoing reasons, we <u>affirm</u> the district court's order of forfeiture but <u>reverse</u> and <u>remand</u> to the extent that the Landman checks are included in the forfeiture.

<u>It is so ordered.</u>

---

[12]We decline the government's invitation to affirm on the alternative ground, adverted to only in passing in its brief, that the depositing of the checks constituted promotion money laundering.  The government has not identified any portion of the record that would justify such a conclusion by this court or any further consideration of the issue on remand.