# United States Court of Appeals
## For the First Circuit

---

No. 07-1215

UNITED STATES OF AMERICA,

Appellee,

v.

ANGELO BRANDAO,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

---

Gordon W. Spencer with whom Carol Mallory was on brief for appellant.
Michael A. Rotker, Attorney, U.S. Department of Justice, with whom Michael J. Sullivan, United States Attorney, and Theodore B. Heinrich, Assistant United States Attorney, were on brief for appellee.

---

August 21, 2008

---

**LYNCH, <u>Chief Judge</u>.** A decade ago there were a series of shootings and murders involving two warring Cape Verdean youth gangs, Stonehurst and Wendover, in Boston and in Brockton, a neighboring community. Federal prosecutions ensued under the Racketeer Influenced and Corrupt Organizations statute ("RICO"), 18 U.S.C. §§ 1961-68, and the Violent Crimes in Aid of Racketeering statute ("VICAR"), 18 U.S.C. § 1959. <u>See</u> <u>United States</u> v. <u>Nascimento</u>, 491 F.3d 25 (1st Cir. 2007) (affirming RICO, VICAR, and firearms violations convictions of three Stonehurst members). This case, against Angelo Brandao, was one of those prosecutions. The indictment charged Brandao, who was eighteen at the time, with conspiracy to commit the 1999 murder of a high school student, Dinho Fernandes, and the shootings of Alcides Depina and Antonio Dias.

Angelo Brandao appeals his conviction on four RICO counts and one VICAR count. The appeal requires us to consider two issues of particular note. One concerns the content of the "associated with," "relatedness," and "pattern of racketeering activity" elements of RICO. Brandao challenges the sufficiency of the evidence that the government presented at trial on each of these elements. The second concerns a constructive amendment of the indictment via the jury instructions and the standard of prejudice that will be applied to his unpreserved claim of error. That issue is the subject of a split among the circuits. We affirm Brandao's

conviction and sentence, acknowledging the able advocacy by defense counsel.

I.

Brandao's numerous attacks on the sufficiency of the evidence require an extensive discussion of the facts of the case. Those facts are taken in the light most favorable to the verdict. United States v. DeCologero, 530 F.3d 36, 47 (1st Cir. 2008). We also account for defense theories in analyzing the permissible inferences from the evidence.

A.       Stonehurst-Wendover Feud

In the early 1990s, Augusto "Gus" Lopes, his younger brother Nardo Lopes, and Bobby Mendes belonged to a group whose activities centered around Wendover Street in the Roxbury neighborhood of Boston. In 1995, Nardo Lopes was charged with the murder of Mendes and fled Boston. Gus Lopes, who was in prison at the time of the killing, vowed to eliminate any potential witnesses to his brother's crime and to exact revenge on members of the Wendover group who remained sympathetic to Mendes and who harassed Lopes's relatives.

After his release from prison, Gus Lopes became close to Amando "Manny" Monteiro. Monteiro is the cousin of the defendant here. In 1997, Monteiro introduced Lopes to others who had preexisting antagonisms with the Wendover group. Lopes joined this Stonehurst group, named after Stonehurst Street in the Dorchester

neighborhood. Lopes and Monteiro became leaders of the Stonehurst group and led Stonehurst members on numerous "missions" to hunt down and shoot members of Wendover. Wendover members did the same as to Stonehurst. The Stonehurst-Wendover shootings reached their apex in the period from June 1998 to July 2000.

B.        <u>Dinho Fernandes Murder</u>

A relatively trivial dispute between classmates at a Brockton high school on the morning of March 17, 1999 started a sequence of events which led to the death of one of the students, Dinho Fernandes. The dispute continued after school ended and a scuffle followed, involving Fernandes and Adalberto Barros at Barros's home. Defendant Brandao was there to support Barros. Both defendant and Barros were cousins of Manny Monteiro.

Later that day, Lopes and Monteiro were at work at a gas station in Brookline, Massachusetts when Monteiro received a page on his beeper around 4:00pm. After answering the page, Monteiro asked to borrow Lopes's car and told Lopes that a "family member" was "having problems" in Brockton. Lopes never knew who made the call. The defense theory was that the call came from Barros, not the defendant. Lopes offered to drive Monteiro to Brockton in Lopes's rental car, a bright red Dodge Stratus. Lopes and Monteiro stopped twice en route, first at Monteiro's house, then in Randolph, Massachusetts to pick up Louis Rodrigues, another member of Stonehurst. Lopes explained to Rodrigues that they were going

to Brockton "to check out Manny's cousin." The trio then drove to Brandao's home in Brockton. There was no evidence about the prior relationship between Brandao and his cousin Manny Monteiro.

Shortly after the Stonehurst members arrived, a blue Honda occupied by Brandao and an unidentified male pulled up behind the Dodge. Although Brandao was Monteiro's cousin, this was the first time Monteiro's friend Lopes ever saw Brandao. The Dodge followed the Honda to nearby Hunt Street, where Brandao pointed out the window of the Honda toward three teenagers standing on the corner who appeared to be of Cape Verdean descent. In the Dodge, Lopes directed Monteiro and Rodrigues to "blaze them." At the time, none of the three Stonehurst members were armed so they needed to get a weapon.

Both cars returned to Brandao's home, which Monteiro entered briefly before returning to the Dodge. There was no evidence on whether Brandao entered the house as well. The Dodge then followed the Honda back toward Hunt Street. Before they arrived, Rodrigues motioned for the Honda to pull over, and both cars stopped by the side of the road. Brandao got out of the Honda, and handed Monteiro, in the Dodge, a 9mm handgun. Brandao returned to the Honda, and the cars again drove toward Hunt Street.

When Lopes spotted the teenagers Brandao had identified, Monteiro fired at them from the back window of the Dodge, emptying

his clip. Two of the teenagers were seriously wounded, and another, Dinho Fernandes, died on the scene.

After the shooting, Lopes, Monteiro, and Rodrigues returned to Brandao's house. Monteiro went into the house with the shooting weapon and came out unarmed. The weapon, a 9mm handgun, had been used in earlier Stonehurst shootings before Brandao handed it to Monteiro.

C.      Antonio Dias Shooting

Within days of the Fernandes murder, Brandao began commuting between Brockton and Boston to meet with Lopes and help him hunt down Wendover members. Among Lopes's targets were Jimmy Gomes and Antonio Dias. Lopes went on about half a dozen missions to Brockton to look for Gomes and Dias between 1998 and 2000. Although Gomes and Dias were not members of Wendover, they had taken the side of a Wendover member in a dispute between him and John and Mario DeSoto. The DeSotos were friends of Lopes as well as Brandao's cousins.

On April 27, 1999, Lopes, Brandao, and Stonehurst member Valdir Fernandes spotted Dias in Brockton during one of their missions. Lopes and Brandao lay in wait for Dias outside of a house. When Dias emerged, Lopes and Brandao fired repeatedly at Dias. The bullets damaged Dias's car, but Dias escaped unharmed.

D.        Alcides Depina Shooting

On the night of May 14, 1999, Jimmy Gomes's brother Alcides Depina was walking towards Gomes's home in Brockton when he noticed an Acura driving slowly towards him with its lights off. A man in a blue jogging suit emerged from the passenger side of the car and ran towards Depina. As Depina ran away, he saw a red beam shining over his shoulder and heard multiple gunshots. Depina managed to reach Gomes's house safely, and the shooter ran back towards the car.

Within minutes, the police responded to calls about the shooting and detained a black Acura at a nearby gas station. Police officers took Depina to the gas station to make a field identification. There, Depina confirmed that the police had detained the black Acura and the man in the blue track suit that had earlier chased him. The man in the track suit turned out to be Stonehurst member Manuel "J" Lopes. Depina also identified the driver of the vehicle as Angelo Brandao, whom he knew because their mothers were acquainted.

Police arrested Brandao and Manuel Lopes and impounded the Acura. A police officer conducting an inventory search of the car at the station house discovered a 9mm Ruger with an attached laser sight concealed behind a panel in the glove compartment. The gun was loaded and the safety was off. Three ballisticians later determined that the gun had been used in the Depina shooting, the

Dias shooting, and another shooting in which two Stonehurst members attacked a Wendover member.

E.          Station House Interview

Police took Brandao, after his arrest, to the Brockton police station for questioning in the early morning hours of May 15, 1999, directly following the Depina shooting. Once at the station house, Brandao asked for Massachusetts State Trooper John Duggan by name. Duggan had previously met with and questioned Brandao during the course of his investigation of the Fernandes murder. Brandao signed a waiver of his Miranda rights, and Duggan and Detective Mark Reardon of the Brockton Police Department began interrogating Brandao at 3:15am.

Brandao appeared calm at first, but when Duggan told Brandao that the police had located the car used in the Fernandes shooting and had a witness who identified the people in the car, Brandao became visibly agitated. Brandao's eyes welled up and he put his head on the table. Brandao asked Duggan, "Is that the car that was in the paper?" Early media accounts of the Fernandes murder had reported that the shooters drove a red Honda. When the police later learned that the car was in fact a red Dodge, they withheld that information from the press to test suspects' knowledge. When Duggan answered Brandao that it was not the car in the papers, Brandao again put his head on the table. Brandao asked Duggan, "What am I looking at, twenty-five to life? I can't do

that time. Even if I tell you what happened, I'm still looking at time."

When Duggan mentioned Gus Lopes in connection with the Fernandes shooting, Brandao replied, "I guess there's nothing left for me to do." He then said that he would tell Duggan the details of the whole story at some point, although he never did.

In July 2000, after years of orchestrating gang warfare, Gus Lopes was arrested when he attempted to buy guns from an undercover police officer. Lopes agreed to cooperate in the government's prosecution of fellow Stonehurst members in exchange for a reduced sentence on the firearms charge.

## II.

On September 30, 2004, a federal grand jury delivered a superseding indictment charging Brandao and twelve others with multiple counts of RICO, VICAR, and firearms violations. The indictment alleged that Stonehurst was a RICO enterprise, the activities of which affected interstate commerce. The indictment imputed multiple purposes to the Stonehurst enterprise, including "to shoot and kill members, associates, and perceived supporters of . . . Wendover" and "to protect and defend its members and associates from acts and threats of violence and to shoot and kill

-9-

other people with whom members and associates of the Enterprise were engaged in violent or drug-related disputes."[1]

The indictment named Brandao individually in eight counts. The first two counts were for racketeering, see 18 U.S.C. § 1962(c), and racketeering conspiracy, see id. § 1962(d), both in violation of RICO. The indictment named Brandao in four specific acts as predicates to the racketeering charge: (1) conspiracy to murder members of Wendover (racketeering Act One); (2) assault with intent to murder Antonio Dias (racketeering Act Ten); (3) assault with intent to murder Alcides Depina (racketeering Act Eleven); and (4) conspiracy to murder Dinho Fernandes (racketeering Act Twenty).

The indictment also charged Brandao under VICAR, see id. § 1959(a), for committing each of these four violent criminal acts in aid of racketeering. The indictment characterized the Dinho Fernandes shooting differently for purposes of the RICO and VICAR charges. While the indictment treated the shooting as "Murder in Aid of Racketeering" (emphasis added) for the VICAR charge, the same activity was described as "conspir[acy] to murder Dinho Fernandes" (emphasis added) for purposes of establishing a predicate act under RICO. Finally, Brandao was charged under 18 U.S.C. § 924(c) for use of a firearm during the Dias and Depina shootings.

---

[1] The indictment also alleged that Stonehurst's activities encompassed the sale of crack and marijuana, but the government abandoned those charges before Brandao's trial.

The district court divided the thirteen Stonehurst defendants into groups for trial.  The connections of the first group of defendants are described in Nascimento, 491 F.3d at 30.  Brandao was tried later with one co-defendant, Brima Wurie, who was acquitted.  On February 9, 2006, following a fourteen-day trial, a jury convicted Brandao on the substantive RICO and RICO conspiracy charges.  The jury also convicted Brandao on the VICAR charge of assault in aid of racketeering based on the Depina shooting and the associated firearms charge.

With respect to the substantive RICO charge, the jury returned special findings that the prosecution had proven beyond a reasonable doubt that Brandao had assaulted Alcides Depina with intent to murder him (racketeering Act Eleven) and conspired to murder Dinho Fernandes (racketeering Act Twenty).  The jury found that the prosecution had not proven beyond a reasonable doubt that Brandao either conspired to murder Wendover members (racketeering Act One) or assaulted Antonio Dias with intent to murder him (racketeering Act Ten).

Brandao submitted a motion for acquittal or for a new trial, which the district court denied in a published opinion on September 8, 2006.  United States v. Brandao, 448 F. Supp. 2d 311 (D. Mass. 2006).  On December 13, 2006, the district court sentenced Brandao to 213 months' imprisonment for the RICO and

VICAR convictions, to be followed by 120 months' imprisonment for the firearms violation.  Brandao timely appealed.

III.

A.     Sufficiency of the Evidence as to RICO and VICAR Convictions

Brandao disputes the sufficiency of the evidence presented at trial to support each charge of conviction. We review the record de novo and affirm the jury's conclusions if we conclude, after looking at all the evidence in the light most favorable to the prosecution, and taking all reasonable inferences in its favor, that a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.  United States v. Connolly, 341 F.3d 16, 22 (1st Cir. 2003); see also United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003).  Our inquiry pays "considerable deference to a jury's assessment of the evidence," and "we will reverse only if the verdict is irrational."  Connolly, 341 F.3d at 22.

1.     Substantive RICO

For a defendant to be convicted of a substantive RICO violation, the government must prove the following elements beyond a reasonable doubt: (1) the existence of an enterprise (2) that affected interstate commerce; and (3) that the defendant was associated with the enterprise; (4) and conducted or participated in the conduct of the enterprise; (5) through a pattern of

-12-

racketeering activity.  <u>Nascimento</u>, 491 F.3d at 31; <u>United States v. Marino</u>, 277 F.3d 11, 33 (1st Cir. 2002).

The first two elements are not contested.  Indeed, in an earlier appeal, this court affirmed jury verdicts that Stonehurst constituted an enterprise and was one that affected interstate commerce.  <u>See</u> <u>Nascimento</u>, 491 F.3d at 45; <u>see</u> <u>also</u> <u>United States v. Patrick</u>, 248 F.3d 11, 19 (1st Cir. 2001) (youth street gang in Boston was RICO enterprise).

Brandao's appeal from RICO convictions focuses on the details of his involvement with Stonehurst in three respects. First, he argues that the government presented insufficient evidence that he was "associated with" Stonehurst at any time before the Dinho Fernandes murder.  Specifically, there was insufficient evidence Brandao had sufficient knowledge there was a Stonehurst gang or that his cousin, Monteiro, was a member of the gang, in order for him to have been associated with Stonehurst at the time of Fernandes's murder.  He concedes the evidence supports an inference that Brandao knew his cousin had a propensity to commit violent crimes, but not that Monteiro's criminality was part of his gang affiliation with Stonehurst.

Second, he argues the evidence did not support the jury's finding that the Fernandes murder was a purpose or affair of the Stonehurst gang, as opposed to a purely personal dispute.

Third, Brandao argues that the evidence does not support the conclusion that the Dinho Fernandes and Alcides Depina shootings constituted a "pattern of racketeering activity."

a. Association[2] -- In order to establish a substantive RICO violation, the prosecution had to prove that Brandao was "associated with" Stonehurst at the time that he committed the predicate racketeering acts.  The murder of Fernandes is the predicate act which concerns us.  The government does not contend that Brandao was associated with Stonehurst before March 17, 1999, but that he became associated with it by his actions that day.  The evidence of defendant's association with Stonehurst after Fernandes was killed for the remaining shootings which are predicate acts cannot be seriously questioned.

Some knowledge of the enterprise is necessary as part of the requirement of showing association with the enterprise.  "The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise."  Marino, 277 F.3d at 33

---

[2]    There is no claim the jury was not properly instructed. The jury instruction here was:
> A person is associated with an enterprise if he knowingly participates, directly or indirectly, in the conduct of the affairs of an enterprise.  One need not have an official position in the enterprise to be associated with it.  One need not formally align himself with an enterprise to associate with it. Association may be by means of an informal or a loose relationship. Mere presence, however, is not enough.

The requirement of association with the enterprise is not strict.

(quoting United States v. Elliott, 571 F.2d 880, 903 (5th Cir. 1978)) (internal quotation marks omitted). "The RICO statute seeks to encompass those people who are 'merely associated with' the enterprise." Id. (quoting Elliott, 571 F.2d at 903). As we held in Marino, "[t]he defendant need only be 'aware of at least the general existence of the enterprise named in the indictment,'" id. (quoting United States v. Console, 13 F.3d 641, 653 (3d Cir. 1993)), "and know about its related activities," id. (quoting United States v. Martino, 648 F.2d 367, 394 (5th Cir. 1981).

As the Fifth Circuit noted some time ago, the point of making the government show that the defendants have some knowledge of the nature of the enterprises is to avoid an unjust association of the defendant with the crimes of others. United States v. Manzella, 782 F.2d 533, 538 (5th Cir. 1986); see also Elliott, 571 F.2d at 903.

In essence, Brandao's claim is that the prosecution failed to introduce any direct evidence that Brandao knew his cousin Monteiro was a member of Stonehurst or even what Stonehurst was. Absent such direct evidence, Brandao argues, the inferences of knowledge from the other evidence are equally balanced and cannot constitute proof beyond a reasonable doubt. See United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998) ("[W]here an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the

-15-

prosecution, 'a reasonable jury must necessarily entertain a reasonable doubt.'" (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)) (internal quotation marks omitted)). We conclude a rational jury could find beyond a reasonable doubt that Brandao had the requisite knowledge, and that the inferences were far from equally balanced. Nascimento, 491 F.3d at 47.

Brandao makes much of the fact that no direct testimony at trial explicitly named Brandao as the party who paged Monteiro at the gas station on the afternoon of the Fernandes murder. The argument is not a strong one. Even if some individual other than Brandao actually spoke with Monteiro on the phone, it is uncontested that as a result of that conversation, Monteiro went to Brockton to help a cousin of his, and that they went to the home of Brandao, a cousin of Monteiro's. They did not go to the home of Barros, whom defendant argues paged Monteiro.

Brandao and Monteiro acted together. Brandao joined his cousin Monteiro at Brandao's home in a Honda, and then led Monteiro's car to the intended victims, where Brandao pointed out the victims. The two cars returned to Brandao's home, then back toward where the victims were. Before reaching the victims, the two cars stopped, and Brandao got out and handed the murder weapon to his cousin Monteiro. Brandao returned to his home. After the shooting, Monteiro returned to Brandao's home and left the home unarmed. This is very strong evidence that Brandao instigated

-16-

Monteiro's trip, and the purpose of the trip was to murder Fernandes.

As Brandao concedes, the jury had ample cause to find that Brandao knew that Monteiro was prone to commit violent crimes. Brandao did not object or pose any questions when Monteiro brought two other men along to assist in the shooting. The very lack of a need for communication between Brandao and his three fellow gang members is strong evidence of familiarity and common purposes. That evidence alone, however, might not be sufficient itself to show beyond a reasonable doubt that Brandao knew that his cousin was a member of Stonehurst, and that by enlisting Monteiro, Brandao was enlisting Stonehurst, the RICO enterprise.

On all of the evidence, a jury could infer beyond a reasonable doubt that Brandao knew that Monteiro, Lopes, and Rodrigues belonged to the Stonehurst group, and that their group regularly engaged in shootings of rival gang members. Monteiro and Lopes were gang leaders; leaders are frequently known by name. The murder of Bobby Mendes and the ensuing conflict between Stonehurst and Wendover affected many members of Boston's Cape Verdean community. Further, Brandao was a cousin to the DeSoto brothers, who were embroiled in a separate dispute with a prominent member of Wendover. Ironically, another of Brandao's cousins, Gelson Brandao, was known to associate with Wendover and was targeted by Stonehurst members, further supporting the inference of Brandao's

-17-

knowledge of the two gangs and who was a member of which. The victim was a member of the Cape Verdean community, as was Brandao. That makes it unlikely Brandao did not know of Stonehurst or Monteiro's association with it.

Brandao argues he lived in Brockton and not in the geographic center of the Stonehurst and Wendover groups, which was in the Dorchester and Roxbury neighborhoods of Boston. But the jury heard evidence that Gus Lopes and other Stonehurst members repeatedly traveled to Brockton on missions in search of rivals to shoot.

The evidence of knowledge goes well beyond the fact that Brandao may have known of Monteiro's relationship with Stonehurst merely because they were cousins. It is unlikely that when commissioning a shooting by his cousin, Brandao was unaware Monteiro's expertise in shooting people came from his being a Stonehurst member.

The jury could also reach its conclusion based on the fact that the gun used to kill Fernandes was a gun which had been used in earlier Stonehurst shootings, and that Brandao had the gun. At trial, Gus Lopes testified that he recognized the gun when Brandao handed it to Monteiro. In fact, Lopes knew the gun to be one that had been used in at least two previous Stonehurst shootings. Police later found the same gun during a search incident to the arrest of Stonehurst member Jackson Nascimento.

-18-

The jury could reasonably infer that this network of personal and family ties and the possession of a gang gun would put Brandao on notice of Stonehurst's "general existence" and "related activities."

b. Relationship of Fernandes Shooting to Stonehurst -- Brandao argues that the prosecution failed to produce sufficient evidence of relatedness between the Fernandes murder and Stonehurst's purposes or affairs to be "through" a pattern of racketeering activities. The prosecution must prove Brandao participated in Stonehurst's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The statute's use of the word "through" implies "a nexus between these racketeering acts and the enterprise." Nascimento, 491 F.3d at 45. "A sufficient nexus or relationship exists between the racketeering acts and the enterprise if the defendant was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of his association with the enterprise." Marino, 277 F.3d at 27.

The jury could reasonably find that the evidence in this case fulfills the test. Brandao did not himself fire the shots which killed Fernandes. Instead, he sought the assistance of three members of Stonehurst who were well-rehearsed in the techniques of drive-by shootings. Brandao quite literally conspired to kill

-19-

Fernandes "by the agency of" and "by the instrumentality of his association with" three members of Stonehurst.

If that were not enough, the "nexus or relationship" test may be met by proof that "the resources, property, or facilities of the enterprise are used by the defendant to commit the predicate acts." Id. at 28. The gun used to kill Fernandes was such a resource. The gun that killed Fernandes passed from the ownership and control of Stonehurst members to Brandao and back again. Evidence that a gun shared amongst Stonehurst members killed Fernandes could permit a rational jury to find a relationship between the shooting and Stonehurst itself.

Brandao mounts a similar attack based on the third element of RICO culpability requiring that a defendant participate in the conduct of the enterprise's affairs. Brandao cites Reves v. Ernst & Young, 507 U.S. 170 (1993), for the proposition that liability under 18 U.S.C. § 1962(c) "depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Id. at 185. Brandao interprets this language as foreclosing RICO liability for predicate acts undertaken for personal motivations.

The argument takes Reves out of context. At issue in Reves was the liability of an outside accounting firm with a mere contractual relationship with the corrupt enterprise. See id. at 186. Cases involving "outsiders" to the enterprise as defendants

-20-

are different from those involving "insiders" as defendants. <u>United States</u> v. <u>Houlihan</u>, 92 F.3d 1271, 1298-99 (1st Cir. 1996). Insiders -- those "who are integral to carrying out the enterprise's racketeering activities" -- by definition participate in the conduct of the enterprise. <u>Id.</u> at 1299.

The jury in this case heard evidence that the Fernandes shooting was related to Stonehurst's affairs. The criminal enterprise here had particularly malleable purposes. The indictment defined that purpose in part as being "to shoot and kill other people with whom members and associates of [Stonehurst] were engaged in violent or drug-related disputes." The jury rationally could have concluded that the purpose of the murder of Fernandes was to kill someone with whom an associate of Stonehurst had a violent dispute.

When asked why he participated in the Fernandes shooting, Gus Lopes testified, "Because Manny was my boy, and that's his cousin, and I'm going to help Manny with whatever problem he's got." The jury could have interpreted this statement as a simple expression of personal loyalty, but also could have concluded otherwise. The other evidence supported an inference that Lopes was motivated by a desire for a quid pro quo that would benefit Stonehurst's interests and further the campaign against Wendover. Marcelino Rodrigues, a Stonehurst member who was incarcerated in mid-1999, testified that Gus Lopes visited him in prison and told

-21-

him about his new acquaintance, Angelo Brandao.  Lopes told Rodrigues that "they both did favors for each other," with Lopes operating in Boston and Brandao reciprocating in Brockton.  That testimony was consistent with Lopes's assertion that Brandao "became part of Stonehurst" on the occasion of the Fernandes shooting.

c. <u>Pattern of Racketeering Activity</u> -- Brandao next argues that the prosecution presented insufficient evidence of a "pattern" of racketeering activity on his part.  A RICO conviction requires proof of "at least two acts of racketeering activity" over a period of ten years.[3]  18 U.S.C. § 1961(5).  More than numbers are required to establish a "pattern" of racketeering acts.  "It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them" a pattern.  <u>H.J. Inc.</u> v. <u>Nw. Bell Tel. Co.</u>, 492 U.S. 229, 238 (1989).  Thus, two or more racketeering predicates constitute a "pattern" if they are (1) "related" and (2) "amount to or pose a threat of continued criminal activity."  <u>Id.</u> at 239.

The "relatedness" prong may be satisfied by proof that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are

---

[3]     There must have been at least two predicate acts in order to make out a pattern under RICO.  <u>See</u> <u>H.J. Inc.</u> v. <u>Nw. Bell Tel. Co.</u>, 492 U.S. 229, 237 (1989); <u>United States</u> v. <u>Cianci</u>, 378 F.3d 71, 88 (1st Cir. 2004).

interrelated by distinguishing characteristics and are not isolated events." Id. at 240 (quoting 18 U.S.C. § 3575(e) (repealed 1987)) (internal quotation marks omitted).  The standard is intentionally flexible, id. at 238, and will take into account the nature of the enterprise.  "[A] criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities.  Versatility, flexibility, and diversity are not inconsistent with pattern."  United States v. Masters, 924 F.2d 1362, 1367 (7th Cir. 1991).

Stonehurst was a criminal enterprise with purposes broad enough to include shooting antagonists of the Stonehurst members as a preferred method of resolving conflict.  The jury could have reasonably concluded that Brandao and Manuel Lopes targeted Alcides Depina for his perceived loyalties, however attenuated, to members of Wendover.

In addition, both the Fernandes and Depina shootings shared distinguishing characteristics common to Stonehurst.  Three prominent members of the gang assisted Brandao in killing Fernandes, while another member accompanied Brandao on the attack against Depina.  Each of those shootings involved guns shared by Stonehurst members and implicated in multiple gang-related shootings.  Both incidents involved drive-by shootings characteristic of Stonehurst's "missions" to hunt and kill Wendover rivals.

Brandao argues, in essence, that the Fernandes and Depina shootings cannot form a "pattern" because they were not directly related to each other. This argument misses the mark. Whether Brandao's motivations for conspiring to kill Dinho Fernandes and assisting in the assault on Alcides Depina were the same, whether identical Stonehurst members accompanied Brandao on both outings, and whether the same gun or car were used in each attack are not dispositive. Rather, the attacks' relatedness to Stonehurst, its purposes, its members, and its methods provides the "external organizing principle" behind both acts.

Likewise, there was sufficient evidence for a finding that Brandao's participation with Stonehurst posed a "threat of continued criminal activity."

> [T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.

H.J. Inc., 492 U.S. at 242-43.

Here, Stonehurst engaged in a long-term campaign of violence aimed at killing members of Wendover and other enemies of Stonehurst members. Once Brandao joined the group, he met with Stonehurst members several times a week with the aim of "helping [them] with shootings." The jury found that Brandao participated in the Depina shooting and heard evidence that he participated in

-24-

the Dias shooting, acts for which Brandao's only motivation was his relationship with Stonehurst.  Once Brandao associated with the enterprise, his violent activity would continue as long as that association continued.

### 2.    RICO Conspiracy

Brandao argues that there was insufficient evidence to support the RICO conspiracy conviction for all of the reasons given above that the substantive RICO conviction must be vacated.  Those arguments fail, as does the argument that there was no agreement to join the RICO conspiracy, as we have just held.

### 3.    Second VICAR Count

Brandao alleges there was insufficient evidence to show, under the second VICAR count, that his shooting of Alcides Depina, on May 14, 1999, was motivated by a purpose of maintaining or increasing his position in Stonehurst.

VICAR prohibits "assault with a dangerous weapon" for "the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).  This circuit has defined the motive requirement in VICAR as a general one, satisfied by proof either that the crime was committed in furtherance of defendant's membership in the enterprise or because it was expected of him by reason of his membership. United States v. Tse, 135 F.3d 200, 206 (1st Cir. 1998); accord Nascimento, 491 F.3d at 47.  In light of the congressional purpose

-25-

in VICAR of curtailing violent activity associated with racketeering enterprises, we rejected a reading that the government must prove this was the sole purpose. Tse, 135 F.3d at 206.

The government argues there was a basis in the evidence for the jury to find either that the crime was committed in furtherance of Brandao's membership or that it was expected by him by reason of his membership. The defendant argues that his motive was personal, and not gang affiliated. He says Depina was not an enemy of Stonehurst, and Depina was shot as a result of Brandao's relationship with DeSoto, which led to Brandao's dispute with Gomes, which led to the shooting. Brandao cites to two cases holding there can be no VICAR liability for purely personal matters. United States v. Bruno, 383 F.3d 65, 85 (2nd Cir. 2004); United States v. Thai, 29 F.3d 785, 818 (2nd Cir. 1994). But those cases are inapposite, involving vastly different facts.

This question of motive under VICAR was for the jury to resolve. The jury had sufficient evidence to support a conclusion that a general motive was that Brandao did what he did, in large part or even solely, to improve his standing or because it was expected of him in Stonehurst or both. By the time of the Depina shooting in May of 1999, Brandao had, a jury could find, been a member of Stonehurst for just two months and, anxious to earn his spurs, he had been helping with shootings. Soon after Lopes, the gang leader, told Brandao about problems with Gomes and Dias,

-26-

Brandao was out with other gang members shooting at Depina, using a gun and a car previously used in gang shootings. A jury could easily conclude that Brandao did so to impress and further ingratiate himself with the gang leader.

B.      Constructive Amendment

Brandao argues that the indictment was constructively amended. The error here was that the jury instruction as to racketeering Act Twenty charged the substantive crime of murder (the murder of Dinho Fernandes), even though the grand jury's indictment had only charged conspiracy to murder.[4] Conspiracy requires the element of agreement, which murder does not. The jury verdict form also described the count as murder rather than conspiracy to murder. The jury found this racketeering act was proven beyond a reasonable doubt as to Brandao.

The district court distributed its draft jury instructions to counsel more than a week before the jury was charged and held two conferences on the instructions in the interim, yet Brandao did not object to the instruction or verdict form as to racketeering Act Twenty. Brandao, 448 F. Supp. 2d at 317. Brandao first raised the constructive amendment issue in a

_____

    [4]    This problem was created by the poor drafting of the indictment. Racketeering Act Twenty was titled "Murder of Dinho Fernandes," even though it charged that Brandao and others "willfully and knowingly did conspire to murder" Fernandes. See Brandao, 448 F. Supp. 2d at 316-17.

post-trial motion, which the district court denied.[5]  Id. at 317, 326.

As an unpreserved objection, Brandao's constructive amendment claim is subject to plain error review.  Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 722, 731 (1993); see also United States v. Johnson, 520 U.S. 462, 466 (1997) (Rule 52(b)'s plain error review applies to all direct appeals from federal convictions, even as to structural errors).  That test has four prongs: there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are satisfied, then a court may exercise discretion to correct a forfeited error if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (alteration in original) (quoting United States v. Young, 470 U.S. 1, 15 (1985)) (internal quotation marks omitted).

We do not explore the question of whether this was in fact a constructive amendment.  In this case, the parties and the district court have agreed that the jury instruction for racketeering Act Twenty was a constructive amendment.  "A constructive amendment occurs when the charging terms of an indictment are altered, either literally or in effect, by

---

[5]     We do not get into the debate between the parties about whether the district court erred in itself utilizing plain error review.

prosecution or court after the grand jury has last passed upon them." United States v. Pierre, 484 F.3d 75, 81 (1st Cir. 2007) (quoting United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993)) (internal quotation marks omitted). In Stirone v. United States, 361 U.S. 212 (1960), the Supreme Court emphasized the rule that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." Id. at 217. The prohibition on constructive amendment exists to preserve the defendant's Fifth Amendment right to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect the defendant's Sixth Amendment right to be informed of the charges against him. Pierre, 484 F.3d at 81 (citing United States v. Vavlitis, 9 F.3d 206, 210 (1st Cir. 1993)). The parties and the district court agreed the first two prongs of plain error review were met: there was error and it was plain.

This brings us to the third prong of the Olano plain error analysis and the heart of the issue in this case. Rule 52(b) requires the plain error to "affect substantial rights," which "in most cases . . . means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734. It is the defendant who bears the burden of demonstrating a reasonable probability that, but for the error, the result of the proceeding would have been

different.  United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004); United States v. Borrero-Acevedo, No. 06-2655, ___ F.3d ___, 2008 WL 2687355, at *3 (1st Cir. July 10, 2008); United States v. Padilla, 415 F.3d 211, 220-21 (1st Cir. 2005) (en banc).

The Supreme Court in Olano reserved the question of whether there might be some errors for which specific prejudice need not be shown.  Olano, 507 U.S. at 735.  In this context, the Court referred to structural errors -- constitutional errors that deprive the defendant of a fundamentally fair trial and thus may not be found harmless under Rule 52(a)'s harmless error standard -- and "those errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice."[6]  Id.  If this category of errors not requiring a showing of prejudice does exist, the Court's conclusion that "[n]ormally, although perhaps not in every case, the defendant must make a specific showing of prejudice," id., suggests that it is very limited.

Brandao argues that constructive amendment falls into this limited category, whether it is labeled structural error or per se prejudicial, and thus that the third prong of the plain

---

[6]    Some have distinguished between these two concepts (structural error and presumed prejudice).  See, e.g., United States v. Syme, 276 F.3d 131, 153 (3d Cir. 2002); United States v. Floresca, 38 F.3d 706, 713 n.16 (4th Cir. 1994) (en banc) (describing "presumed prejudice" as a separate category of errors and suggesting that the Court was referring to errors necessitating a rebuttable presumption).  Whether or not there is a distinction, it does not affect our analysis or conclusion.

error test is automatically satisfied in this case. He points to dicta in this circuit's case law and to the broad language of the Supreme Court's decision in Stirone in support of his position. We have never confronted this question directly, and our sister circuits have reached disparate conclusions.

The Fourth Circuit has held that the constructive amendment of an indictment is a structural error. United States v. Floresca, 38 F.3d 706, 713 (4th Cir. 1994) (en banc). The Second Circuit has held that it is per se prejudicial. United States v. Thomas, 274 F.3d 655, 670 (2d Cir. 2001) (en banc); see also United States v. Ford, 435 F.3d 204, 216 (2d Cir. 2006). Both circuits thus presume that a constructive amendment will always satisfy the third prong of Olano.

The Fifth, Seventh, Ninth, and District of Columbia Circuits adhere to the usual plain error formulation when considering constructive amendments, requiring the defendant to bear the burden of showing specific prejudice. United States v. Hugs, 384 F.3d 762, 768 (9th Cir. 2004) (finding that a constructive amendment error did not violate defendant's substantial rights under prong three without discussion of per se prejudice or structural error); United States v. Fletcher, 121 F.3d 187, 192-93 (5th Cir. 1997), abrogated on other grounds as recognized by United States v. Robinson, 367 F.3d 278, 286 n.11 (5th Cir. 2004); United States v. Remsza, 77 F.3d 1039, 1044 (7th

-31-

Cir. 1996); United States v. Lawton, 995 F.2d 290, 294 (D.C. Cir. 1993) (finding that a constructive amendment error was prejudicial under prong three without discussion of per se prejudice or structural error). Both the Fifth and the Ninth Circuits have recognized that their pre-Olano jurisprudence required automatic reversal for constructive amendments even on plain error review, but that more recent Supreme Court case law had raised serious doubts that such a per se approach was still appropriate. United States v. Dipentino, 242 F.3d 1090, 1095 (9th Cir. 2001); Fletcher, 121 F.3d at 192-93; see also United States v. Daniels, 252 F.3d 411, 414 n.8 (5th Cir. 2001) (describing Fletcher as replacing automatic reversal rule in constructive amendment cases with standard plain error review in order to align with Olano).[7]

Finally, the Third Circuit alone has departed from the usual plain error protocol and fashioned a rebuttable presumption of prejudice for unpreserved claims of constructive amendment on plain error review. United States v. Syme, 276 F.3d 131, 154 (3d Cir. 2002) (en banc); see also United States v. McKee, 506 F.3d

---

[7]     The Tenth Circuit has avoided the question altogether by instead finding Olano's fourth prong unsatisfied, similar to the Supreme Court's approach in Johnson and United States v. Cotton, 535 U.S. 625 (2002). See United States v. Brown, 400 F.3d 1242, 1253-54 (10th Cir. 2005); United States v. Gonzalez Edeza, 359 F.3d 1246, 1250-52 (10th Cir. 2004). In Brown, however, the Tenth Circuit noted that following Cotton, any tension in its case law between automatic reversal and plain error review of unpreserved claims of constructive amendment must be resolved against automatic reversal. Brown, 400 F.3d at 1253 n.6.

-32-

225, 229 (3d Cir. 2007).  On the assumption that it will normally be difficult for a defendant to prove a constructive amendment resulted in prejudice, that circuit presumes a defendant has met the prejudice requirement of the third prong unless the government meets its burden of rebuttal.[8]  Syme, 276 F.3d at 154.

This circuit's cases have often described constructive amendments as "prejudicial per se," but always in dicta.  This "per se" language seems to have begun with dicta in United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985), and has carried through in many a circuit case since, most recently in United States v. Bucci, 525 F.3d 116, 131 (1st Cir. 2008).  In almost every one of these cases, the court found no constructive amendment and thus no error, whether or not the objection had been preserved in the district court.[9]

---

[8]    The court in Syme noted, however, that even though it believes that constructive amendments are presumed prejudicial, it doubts that constructive amendments would be structural error, given recent Supreme Court decisions.  276 F.3d at 155 n.10.

[9]    Bucci, 525 F.3d at 131; United States v. Hernández, 490 F.3d 81, 83-84 (1st Cir. 2007); United States v. Malpica-García, 489 F.3d 393, 398 (1st Cir. 2007); Pierre, 484 F.3d at 81-82; United States v. Mueffelman, 470 F.3d 33, 38 (1st Cir. 2006); United States v. DeCicco, 439 F.3d 36, 43, 46-47 (1st Cir. 2006); United States v. Gómez-Rosario, 418 F.3d 90, 104-05 (1st Cir. 2005); United States v. Fornia-Castillo, 408 F.3d 52, 65-66 (1st Cir. 2005); United States v. Cianci, 378 F.3d 71, 93-94 (1st Cir. 2004); United States v. Dubón-Otero, 292 F.3d 1, 4 & n.2 (1st Cir. 2002); United States v. Portela, 167 F.3d 687, 701-02 (1st Cir. 1999);  United States v. Paredes-Rodriguez, 160 F.3d 49, 55 (1st Cir. 1998); Vavlitis, 9 F.3d at 210; United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993); Dunn, 758 F.2d at 35, 38.

Only two of our cases require further discussion. In _United States_ v. _Iacaboni_, 363 F.3d 1 (1st Cir. 2004), the defendant pled guilty to one type of money laundering, but the district court ordered forfeiture under a different theory of money laundering. _Id._ at 7. We reversed the relevant portion of the forfeiture order because we concluded a constructive amendment had occurred and that such an "alteration is . . . per se prejudicial." _Id._ That case is distinguishable. First, we held that the defendant had preserved his claim below, so the question of plain error review was not implicated. _Id._ Second, _Iacaboni_ considered an error in sentencing, not an error in conviction, and the distinction could be meaningful; in _Iacaboni_, for instance, the constructive amendment led directly to a forfeiture order amounting to $7,495, clearly a prejudicial outcome.

As for _United States_ v. _Santa-Manzano_, 842 F.2d 1 (1st Cir. 1988), the court spoke there in terms of variance, not constructive amendment; it predated _Olano_; it did not use the language of prejudice per se; and it described the variance in terms of prejudice, namely that the defendant did not have adequate

-34-

notice of the charges against him.[10]  Id. at 2-3.  These cases do not address or resolve the question before us today.

Thus we are confronted squarely with this question for the first time.  We agree with those circuits that apply the standard prejudice evaluation to constructive amendment claims on plain error review and do not presume prejudice.  We do so for several reasons.

First, the Supreme Court's jurisprudence is increasingly wary of recognizing new structural errors or otherwise establishing per se outcomes under plain error review.  When listing structural errors in recent cases, the Court has not included constructive amendments.  See Washington v. Recuenco, ___ U.S. ___, 126 S. Ct. 2546, 2551 n.2 (2006); Neder v. United States, 527 U.S. 1, 8 (1999); Johnson, 520 U.S. at 468-69.  The Court has also expressed unwillingness to expand that list of structural errors any further, recognizing that "most constitutional errors can be harmless." Neder, 527 U.S. at 8 (quoting Arizona v. Fulminante, 499 U.S. 277, 306 (1991)) (internal quotation marks omitted).  Indeed, the Court has said "if the defendant had counsel and was tried by an

_____

[10]   Our opinion in United States v. Mojica-Baez, 229 F.3d 292 (1st Cir. 2000), dealt with failure to submit an element of an offense to the jury, which meant that the defendant was sentenced for a more serious offense than that for which he was indicted and found guilty.  Id. at 306.  On plain error review, we rejected defendant's argument that the error should be considered a structural error and required a showing of prejudice under prong three.  Id. at 307, 309-10.

impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis" and are thus not structural errors. Id. (quoting Rose v. Clark, 478 U.S. 570, 579 (1986)) (internal quotation marks omitted). In recent years, the Court has routinely rejected arguments that additional specific categories of errors should be considered structural errors. See, e.g., id. at 8 (omission of element of offense in jury instructions); Fulminante, 499 U.S. at 310-11 (collecting cases). This unwillingness is even more pronounced in the plain error context, with the Court bluntly stating that "[a] per se approach to plain-error review is flawed." Young, 470 U.S. at 16 n.14. In keeping with this trend, this court, sitting en banc in Padilla, refused to expand the category of structural errors beyond those already recognized by the Supreme Court, noting the category has been reserved for a very limited class of cases involving "only the most pervasive and debilitating errors." 415 F.3d at 219.

Second, there are good reasons not to extend the list of structural errors to include constructive amendments. Constructive amendments come in many varieties: some constructive amendments broaden indictments; some effectively narrow indictments. In many cases, constructive amendments will not be the sort of error that will "deprive defendants of 'basic protections' without which a 'criminal trial cannot reliably serve its function as a vehicle for

-36-

determining guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.'" Neder, 527 U.S. at 8-9 (quoting Rose, 478 U.S. at 577-78). We believe this case demonstrates that point. Because the term "constructive amendment" includes a number of different types of errors, some of which will not always be prejudicial, the term "constructive amendment" does not create a good candidate for departing from usual plain error review. Cf. id. at 14 (describing approach to structural errors as traditionally categorical: "a constitutional error is either structural or it is not"). Labels like "constructive amendment" should rarely dictate outcomes. We also agree with the Fifth Circuit that abandoning the usual plain error rule will create perverse incentives which may harm the administration of the criminal justice system. See Fletcher, 121 F.3d at 193; see also Floresca, 38 F.3d at 727 (Russell, J., dissenting).

Third, Stirone does not, as defendant argues, compel a contrary conclusion. In Stirone, a union official was charged with violating the Hobbs Act, 18 U.S.C. § 1951, by interfering with interstate commerce through extortion. 361 U.S. at 213. The indictment charged Stirone with obstructing shipments of sand to Pennsylvania to make concrete to build steel mills, but the judge allowed the government to argue that Stirone's actions also affected interstate commerce by interfering with the steel mill's ability to ship steel from Pennsylvania. Id. at 213-14. Because

the jury was allowed to convict on either theory of interference with interstate commerce, and because the indictment had made no mention of the second theory, it was possible that Stirone had been convicted on a charge not made (and not intended) by the grand jury. Id. at 214, 218-19. The Supreme Court reversed the conviction, holding that the trial court had impermissibly broadened the indictment in violation of defendant's constitutional rights. Id. at 219.

Significantly, Stirone did not involve the issue which confronts us here: in Stirone, the objection to the constructive amendment was preserved; the case did not involve plain error review at all.[11] 361 U.S. at 214. Under modern Supreme Court jurisprudence, the difference between harmless error and plain error review is a meaningful one. See, e.g., Johnson, 520 U.S. at 469-70 (even structural errors are subject to plain error review's fourth prong).

We also note that the Supreme Court has never specifically resolved "the more sophisticated question of whether a structural error necessarily affects substantial rights, thereby automatically satisfying the third element of the plain error test." Padilla, 415 F.3d at 220 n.1. Some courts have concluded that errors that cannot be harmless must also be per se prejudicial

---

[11] The government argues Stirone may have involved, in today's terminology, a variance and not a constructive amendment. We do not address the issue.

under Olano's third prong.  See id. (collecting cases).  But that is not a necessary outcome.  See, e.g., Syme, 276 F.3d at 152 (noting that per se reversal rule for preserved errors might not extend to plain error review); Remsza, 77 F.3d at 1044 (noting that circuit's rule requiring prejudice analysis for all errors on plain error review); Floresca, 38 F.3d at 722-23 (Russell, J., dissenting) (disagreeing with majority's presumption that errors not subject to harmless error review will also not necessitate a showing of prejudice under plain error review).  Thus even if Stirone does require automatic reversal of constructive amendments for preserved claims of error on harmless error review, that would not necessarily mean that prejudice should be presumed on plain error review.

Further, the Court has not extended Stirone's per se reversal approach to closely related situations.  See Neder, 527 U.S. at 8 (omission of element of offense in jury charge not a structural error); Johnson, 520 U.S. at 469-70 (refusing to exercise discretion under Olano's fourth prong where trial court failed to submit element of offense to jury); United States v. Miller, 471 U.S. 130, 145 (1985) (finding no violation of grand jury right where charges in indictment were broader than proof presented at trial).  The facts of this case make it likewise distinguishable from Stirone, as discussed below.

-39-

We also decline to alter the usual plain error standard to provide defendant with a presumption of prejudice that would shift the burden to the government to show lack of prejudice. We see no basis in Supreme Court holdings to do so.[12] We will not conclude that in all cases it will be "well-nigh impossible to determine the amount of harm" resulting from a constructive amendment. United States v. Mojica-Baez, 229 F.3d 292, 309 (1st Cir. 2000). We believe that, depending on the facts of a given case, some constructive amendments will, by their nature and from the risks they create for defendant, be so great that a reviewing court may find the requisite prejudice under Olano's third prong.

We hold that the defendant must make the required showing of prejudice under Olano and its progeny. Defendant here cannot meet his burden. Defendant views the error as involving primarily his Fifth Amendment rights to a grand jury indictment; the district court viewed the error as involving primarily defendant's Sixth Amendment rights. However considered, this constructive amendment did not seriously jeopardize defendant's rights and did not present a reasonable probability of affecting the outcome of the district court proceedings.

As the district court astutely pointed out, here, "unlike Stirone, Defendant was not charged with an act not alleged at all

---

[12] We acknowledge the Third and the Fourth Circuits' argument that there is such a basis based on dicta in Olano. See Syme, 276 F.3d at 153; Floresca, 28 F.3d at 713 n.16.

in the indictment." Brandao, 448 F. Supp. 2d at 319. Although racketeering Act Twenty under Count Two of the indictment charged conspiracy to murder, and not murder, the grand jury alleged in Count Thirty-Three that Brandao murdered Fernandes when it charged that Brandao committed the murder to maintain or increase his position in the Stonehurst enterprise. We do not have to speculate whether the grand jury would have indicted Brandao for the actual murder of Fernandes; in practical terms it did. Cf. Stirone, 361 U.S. at 217 (noting that no court "can know that the grand jury would have been willing to charge" defendant on grounds not mentioned in indictment but presented to petit jury); Thomas, 274 F.3d at 670 (warning against speculating what a grand jury might have charged in its indictment). We thus have no concerns that the grand jury would have returned a conforming indictment charging murder. For the same reason, Brandao was provided adequate notice of the charges against him. Cf. Miller, 471 U.S. at 134-35 (noting lack of notice concerns in finding no error where variance narrowed indictment); Hugs, 384 F.3d at 768 (finding no prejudice where indictment provided fair notice of evidence that would be introduced at trial).

The district court also cogently explained why the error could not have affected the trial's outcome: given the evidence at trial, the jury could not have found Brandao guilty of murder (the amended charge) if it had not also found he had colluded with

-41-

others to carry out the murder. "Because the government never suggested that Defendant pulled the trigger, an agreement was a necessary condition of the jury's finding Defendant guilty of the substantive murder via an aiding and abetting theory." Brandao, 448 F. Supp. 2d at 323-24.[13]

Indeed, as the district court and the government have noted, this case resembles those cases in which the court erroneously omits an element of an offense when instructing the jury (here the element of agreement). See id. at 324. Given the evidence at trial and the jury's actual verdict, the record could not "rationally lead to a contrary finding with respect to the omitted element," the prejudice analysis applied in Neder. 527 U.S. at 19.

This case does not raise concerns of adequate notice, of whether the grand jury would have indicted on the amended charge, or of material unfairness to the defendant. There was no prejudice. We add, but do not rely on, our view that Brandao's claim would fail in any event under the fourth prong of the plain error test.

---

[13]    The fact that the jury acquitted Brandao on Count Thirty-Three does not call this reasoning into doubt. As the district court explained, the jury could have found Brandao guilty of murdering Fernandes while not also finding that, as required for a VICAR conviction, he committed the murder to maintain or improve his position in Stonehurst. Brandao, 448 F. Supp. 2d at 320. Rather, the evidence presented at trial could have allowed the jury to find that Brandao's participation in the Fernandes murder provided Brandao's entry into the Stonehurst enterprise. Id.

C.        Prosecutor's Closing Arguments

Brandao argues that the prosecutor made improper comments in closing, and those remarks so offended defendant's due process rights as to deny him a fair trial.  The usual test is whether the prosecutor's misconduct "'so poisoned the well' that the trial's outcome was likely affected."  United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007) (quoting United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999)) (internal quotation marks omitted).  But here there was no objection, so review is for plain error.

The claim is that there were two types of impropriety in the closing: that certain arguments had no basis in the evidence and that one remark impermissibly broadened the indictment.  We disagree.  See United States v. Duval, 496 F.3d 64, 78 (1st Cir. 2007).

Brandao objects to the prosecution's statements that his actions before and after the Fernandes shooting demonstrated Brandao was "enlisting [Stonehurst's] services."  The statement was relevant to the element of the nexus between the shooting and the enterprise.  The prosecution did nothing wrong in asking the jury to draw this permissible inference from the evidence.  United States v. Hernández, 218 F.3d 58, 68-69 (1st Cir. 2000).

The second claim is that the prosecution broadened the indictment when, during rebuttal, at closing, the prosecutor said, "any problem of a member was the gang's problem."  The argument was

made in response to a key theme in the defense's closing: that each of the charged shootings was personal and therefore unconnected with the RICO enterprise.  It was fair for the prosecution to argue that merely because there was some personal benefit from a shooting did not mean the shooting was unconnected from the enterprise. While it is not literally true in the abstract that any problem of a member was the gang's problem, in context, there is no reason to believe the jury took the government to be arguing that.

The prosecutor did overstate in its closing, in one sentence made in anticipation of a defense argument.  The prosecutor said the "shootings . . . were related to the affairs of the enterprise and were to protect people in order to carry on their business, in order to recruit."  (Emphasis added.)  While the statement may be true in other cases, the government, on appeal, admits there was no evidence that Stonehurst tried to recruit Brandao.  But attorneys for both sides misspeak during closings, and there is no reason to think this lone comment had any effect on the jury.  The transcript of the prosecutor's closing is thirty-seven pages.  United States v. Allen, 469 F.3d 11, 16 (1st Cir. 2006).  The statement did not even evoke an objection from defense counsel, and the court instructed that the closing arguments were not evidence.

We reject the claim of error.

D.        Denial of Motion for a New Trial: Claim the Government
          Suppressed Impeachment Material

The district court rejected Brandao's motion for a new trial based on his claim that the government suppressed potential impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963). "Impeachment evidence must be material before its suppression justifies a new trial." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005). Review of the district court's decision to deny a defendant's motion for a new trial on the basis of alleged Brady violations is for manifest abuse of discretion. United States v. Morales-Rodríguez, 467 F.3d 1, 14 (1st Cir. 2006).

The court found there was no bad faith involved in the prosecution's failure to learn and to disclose that Lopes, its key witness, had a new state criminal conviction, after it had told the defense about the underlying state charges. Such a conviction violated his federal plea agreement and yet he was not punished. This would have given defense counsel an argument to counter the government's assertion that Lopes's plea agreement gave him every incentive to tell the truth for fear of punishment.

The court found that while there was some impeachment value to the evidence, the evidence was cumulative of a great deal of other evidence that Lopes had incentive to lie. Brandao, 448 F. Supp. 2d at 328. But the court also noted that Lopes's basic story about the events in this case had not changed over the four years before trial. Id. And Lopes's testimony was reinforced by

Brandao's own statements to the police, by ballistics evidence, and by the discovery of a firearm in the car Brandao drove for the Depina shooting.  Id.

There was no abuse of discretion in finding this omission was not material.

E.        Sentencing

The district court sentenced Brandao to a total sentence of 333 months' imprisonment, rejecting the government's recommendations that would have effectively amounted to life imprisonment.  To Brandao's benefit, the court imposed concurrent twenty-year sentences on the two RICO counts (reduced for time served) and added the mandatory consecutive ten-year sentence on the VICAR count.  The court then adjusted the twenty-year sentence downward by subtracting twenty-seven months to account for the time Brandao spent in state custody on the Depina shooting.  The court ordered a five-year period of supervised release and ordered restitution of $6,955 to Dinho Fernandes's family to pay for the funeral service.

Brandao argues that the sentence was unreasonable because it was disproportionate to his activities and criminal history and because it created an unwarranted disparity with other defendants, more culpable, he says, than he.

The district judge presided over and sentenced the defendants in both this and the Nascimento case.  The court

thoughtfully explained its rationale for the sentence. The fact that the court did not explicitly mention the 18 U.S.C. § 3553(a) sentencing factors means nothing in this case, as the court obviously considered them. See United States v. Alli, 444 F.3d 34, 41 (1st Cir. 2006) (affirming sentence where district court did not explicitly address any of the § 3553(a) factors individually).

The court addressed both Brandao's particular activities in the commission of the crime and his criminal history. The court took into account that Brandao did not shoot Fernandes and that Monteiro did. The judge considered the defendant's lack of a criminal record and could find no reason in his background to explain Brandao's crimes. The court also considered Brandao's luck that Lopes was a "lousy shot" and did not manage to kill Depina. The court also recognized that Stonehurst gunned down people for trivial gripes, leading to longstanding and senseless violence in the community.

As to the supposed disparity with the other Stonehurst defendants, the court also considered and explained the dispositions for the other players: those were largely driven by the prosecution's charging decisions, the strength of the evidence against the various defendants, and the fact that Monteiro pled guilty while Brandao chose to go to trial. The court's conclusion that the players were not similarly situated was entirely reasonable. See United States v. Cirilo-Muñoz, 504 F.3d 106, 134

(1st Cir. 2007) (co-defendant who pled guilty is not similarly situated to co-defendant who was found guilty by a jury).

Even before the Supreme Court's decisions in <u>Gall</u> v. <u>United States</u>, ___ U.S. ___, 128 S. Ct. 586 (2007), and <u>Kimbrough</u> v. <u>United States</u>, ___ U.S. ___, 128 S. Ct. 558 (2007), we would have found no fault in this sentence and we find none today.

## III.

The convictions and sentence are affirmed.

**-Concurring Opinion Follows-**

**LIPEZ, Circuit Judge, concurring.** I concur with the majority's sufficiency of the evidence analysis and its conclusion that we should apply the standard prejudice framework to constructive amendment claims on plain error review and not presume prejudice. However, I adopt that conclusion only because of my agreement with the majority that many so-called constructive amendment claims lend themselves readily to ordinary plain error analysis. This case illustrates that point well.

For me, this rationale alone justifies our conclusion that the standard prejudice framework should apply to unpreserved constructive amendment claims. I specifically do not join the majority's analysis of the Supreme Court's jurisprudence related to structural errors and the compatibility of a presumption of prejudice with the Supreme Court's plain error jurisprudence. In my view, that analysis is not essential to our conclusion on the consequences of a constructive amendment that was not the subject of a timely objection.